[Crim. No. 19687. Second Dist., Div. Five. June 20, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY G. HENDERSON, Defendant and Appellant.

[Crim. No. 20170. Second Dist., Div. Five. June 20, 1972.]

In re RODNEY G. HENDERSON on Habeas Corpus.

(Consolidated Appeals.)

## COUNSEL

Joan Celia Lavine, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Williams E. James, Assistant Attorney General, William K. McCallister, Jr., and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Appeal from a conviction under section 211 of the Penal Code (robbery) and petition for writ of habeas corpus. On the basis of the petition this court granted an order to show cause why the writ should not issue. Respondent State of California filed a combined respondent's brief to the appeal and return to the order to show cause.

### THE APPEAL

Defendant waived trial by jury. The only evidence presented against him was the testimony of William B. Taylor, the robbery victim, a special agent for the United States Department of Justice, Bureau of Narcotics and Dangerous Drugs. Taylor testified that on May 12, 1970, he, with another officer, was involved in an undercover investigation of narcotics activity. He and his partner met the suspects in the investigation, Donald Henderson—defendant's brother—and Herbert Riley, evidently for the purpose of purchasing narcotics. At the direction of Donald Henderson the agents followed the suspects by car to an apartment at 240 East 60th Street in Los Angeles. Taylor and Donald Henderson went into the apartment; the other agent and Riley did not.

Sometime after that Taylor and Donald Henderson left the apartment by way of a corridor to the rear of the building. When they reached the carport area next to the alley, defendant was standing in the shadows of the carport and, in response to a statement by Donald Henderson, said: "Right here, motherfucker." Defendant was holding a shotgun pointed at Taylor. He stood about 10 feet away. He demanded that Taylor empty his pockets on the ground. Taylor complied. Donald Henderson retrieved the money from the ground while holding a chrome-plated revolver on Taylor.

After he had emptied all his other pockets, Taylor pulled his badge out of his rear pocket, identified himself as a federal officer, and ran. He had been carrying about $2,045, $2,000 of which had been issued to him for the purpose of purchasing narcotics in the course of his investigation.

Taylor testified that he was able to observe defendant's face for about five minutes, the entire time of the event. The robbery occurred at about 8:20 in the evening; there were no streetlights in the area, but there was some illumination from the upstairs apartments. He had never seen defendant before the robbery.

The People rested at the conclusion of Taylor's testimony. Defendant

called Donald Henderson. His description of the events of the evening was in all pertinent respects the same as Taylor's up to the point where he and Taylor left the apartment. According to Donald Henderson they left the apartment after about two or three minutes, and walked down the corridor to the alley. When they reached the alley he, Donald, said "Chewy, Chewy, where are you?" Riley turned around with a shotgun in his hand, and said "Right here." Donald Henderson described the details of the robbery much the same as Taylor had, but identified the other party as Riley, not his brother. He also said that he, not the party with the shotgun, had ordered Taylor to empty his pockets, and that Taylor never showed his badge, but instead just said "I'm the man" and ran. Donald Henderson and Riley were arrested three days later; defendant was arrested on June 4.

At the close of Donald Henderson's testimony the defense rested. The trial judge indicated that he felt that Donald Henderson's testimony was motivated by a desire to help his brother, and was therefore untrustworthy. He also felt that the possibility of a mistake in Taylor's identification of defendant was minimal because of his training as an officer, and further that Taylor would have recognized Riley as the man with the shotgun at the time of Riley's arrest.

None of the points made by appointed counsel as far as the appeal is concerned—except the issue about to be discussed—has any merit. We do not mean to slight counsel whose diligence is almost above and beyond the call of duty; nevertheless, we do not feel that we have the right to entertain a captive reading audience with a learned discussion on such nonissues as whether or not the conviction violates due process because the prosecution failed to offer evidence whether anybody besides Taylor knew that he had $2,045 in his possession or because the evidence is wholly insufficient. (*Thompson* v. *Louisville.* 362 U.S. 199, 206 [4 L.Ed. 2d 654, 659, 80 S.Ct. 624].)

As far as the appeal is concerned, the only issue worth discussing is whether the trial court committed error when, in addition to finding defendant guilty of robbery, it also found that the provisions of section 12022.5 of the Penal Code applied and ordered defendant's sentence increased accordingly.

Section 12022.5 became effective a few months before the instant crime was committed and provides an additional consecutive penalty of not less than five years for anyone who uses a firearm in the commission of certain crimes, including robbery.

The information in the case at bar charged that at the time of the

commission of the robbery defendant was armed with a deadly weapon, to wit, a shotgun. It said nothing about his having used the shotgun, nor did the information refer to section 12022.5 in any way. As far as the pleading of the circumstances authorizing the additional minimum imprisonment of five years is concerned, this case is, therefore, indistinguishable from *People* v. *Washington,* 17 Cal.App.3d 470 [94 Cal.Rptr. 882]. In that case the court held that the pleading of being armed with a .22 caliber revolver adequately put the defendant on notice that he was being charged with using the firearm. The court justified its holding by pointing to the fact that "using" was a narrower term than "being armed." It also said that, inasmuch as firearms were included in the definition of deadly weapons, contained in section 3024, subdivision (f) of the Penal Code, "a 'deadly' weapon allegation would necessarily be broad enough to entail a 'firearm' allegation."[1] In any event the court in *Washington* went on to point out that the information did identify the deadly weapon as a .22 caliber revolver—obviously a firearm. In the case at bar a shotgun is specifically alleged. We therefore assume, at least for the sake of argument, that the information is adequate as far as the allegation of a firearm is concerned. Our problem thus boils down to the question whether an allegation that the defendant was armed with a firearm, will support a finding that he used it.

What the pleader in the case at bar did—presumably from habit—was to charge, as a "portion"[2] of the robbery count the facts which under certain circumstances prescribe a minimum punishment (Pen. Code, § 3024) or additional punishment (Pen. Code, § 12022) when a defendant is armed with a deadly weapon. (See generally *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].) Of course, when defendant was charged in the case at bar it was well settled by *People* v. *Floyd, supra,*

---

[1]One problem with that aspect of the holding is that section 12022 of the Penal Code on which the information in *Washington* was obviously based—as is the one here—specifically refers to "deadly weapons, as defined by subdivision (f) of section 3024." Section 12022.5 under which both Washington and this defendant were sentenced contains no such cross-reference.

[2]This is the language of section 969c of the Penal Code. That section which, among other provisions, demands the pleading of the facts relating to a charge under sections 3024 or 12022 of the Penal Code, was not amended to refer to section 12022.5, when it was added to the Penal Code in 1969. This is apparently just legislative oversight. (See *People* v. *Spencer,* 22 Cal.App.3d 786, 801-802 [99 Cal.Rptr. 681].) We need not decide whether a pleading of facts which merely enhances the penalty for a charged crime is constitutionally required. As we point out in the opinion, the pleading in the case at bar did not just fail to advise defendant that the People would seek to subject him to an additional prison term of at least five years. By pleading the facts which would bring the consequences of section 12022 into operation, the pleading positively misleads the reader into believing that section 12022.5 would not be invoked.

that if his being armed with a deadly weapon was to be the basis for a conviction of robbery in the first degree, sections 3024 and 12022 of the Penal Code would be inapplicable. Defendant's only detriment would be a finding which might contraindicate a grant of probation in any future prosecution. On the other hand, if charged, section 12022.5 would be applicable by virtue of the last paragraph of the section.[3] Applied to the facts of this case it is clear that a section 12022.5 charge was more serious than one under section 12022 by "not less than five years" in prison with a possible maximum of life.[4] However when defendant was first served with and read the information he had no more reason to believe that the People were attempting to subject him to any such additional punishment by proving that he was not only armed with the shotgun, but actually used it, than does a person who is charged with simple kidnaping (Pen. Code, § 207) have to fear life imprisonment if later proof should show that he kidnaped for ransom. (Pen. Code, § 209.)

Of course the court, in *Washington,* is entirely correct in pointing out that "using" is narrower than "being armed." The one is a specific instance of the other, since it is impossible to use a firearm without being armed with it.[5] So, however, is assault with a deadly weapon a specific way of committing assault; but the point is that assault with a deadly weapon carries a maximum penalty of life imprisonment (Pen. Code, § 245), while simple assault cannot get you more than six months in the county jail (Pen. Code, § 241), and there is no way of convicting a defendant of the greater offense without charging him with it. In the case at bar the difference between using a firearm and being merely armed with one was the difference between a consecutive prison term of five years to life (Pen. Code, §§ 671, 12022.5) and a bad report card.

It is obvious that every time the People prove a crime which a statute

---

[3]"This section shall apply even in those cases where the use of a weapon is an element of the offense."

[4]We say "possible" maximum for the following reason: section 12022.5 only mentions a minimum additional term of five years. In such a case, if the section defined a crime, section 671 of the Penal Code would come into play. It reads, in pertinent part, as follows: "Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, punishment of such offender shall be imprisonment during his natural life. . . ." The problem is that section 12022.5 does not define a crime in the ordinary sense of the word. It merely imposes additional punishment when certain felonies are committed with the use of a firearm. (See *In re Shull,* 23 Cal.2d 745, 749 [146 P.2d 417].)

[5]The analogy to the law relating to necessarily included lesser offenses (Pen. Code, § 1159) immediately comes to mind. Reflection, however, will soon indicate that in the context of sections 12022 and 12022.5 of the Penal Code using a firearm is not a necessarily included lesser "offense," but a possibly involved greater one.

defines in general terms, they necessarily prove a more specific—or, if you will, "narrower"—set of facts. Under our system of simplified criminal pleading (Pen. Code, § 952) coupled as it is with liberal discovery, the defendant usually cannot complain that the People's proof is more specific than the charge. (Cf. *People* v. *Jordan,* 19 Cal.App.3d 362, 368-369 [97 Cal.Rptr. 570].) Nor does it matter that a statute under which the defendant is not charged prescribes a heavier punishment for the actual act proved, as long as the People do not attempt to exact that punishment. For example, it is no cause for complaint on a charge of contributing to the delinquency of a minor (Pen. Code, § 272—maximum 1 year county jail) that the proof shows unlawful sexual intercourse (Pen. Code, § 261.5 —maximum 50 years state prison), formerly known as statutory rape.

In legal effect, however, that is precisely what has happened here. The section 12022 charge exposed defendant, if convicted of first degree robbery, to no punishment whatever as far as this case is concerned. The section 12022.5 finding put him behind bars for a minimum of five years and a possible maximum of life. Regardless of the fact that the evidence amply justified the finding, the lack of notice in the charge makes the finding impermissible, absent a most radical reinterpretation of the due process clause. (*Cole* v. *Arkansas,* 333 U.S. 196, 201 [92 L.Ed. 644, 647, 68 S.Ct. 514]; *In re Oliver,* 333 U.S. 257, 273 [92 L.Ed. 682, 694, 68 S.Ct. 499]; *People* v. *West,* 3 Cal.3d 595, 612 [91 Cal.Rptr. 385, 477 P.2d 409]; *In re Hess,* 45 Cal.2d 171, 175 [288 P.2d 5]; *Mandel* v. *Municipal Court,* 276 Cal.App.2d 649, 672-673 [81 Cal.Rptr. 173]; *In re Liu,* 273 Cal.App.2d 135, 141 [78 Cal.Rptr. 85]; *People* v. *Wilson,* 271 Cal.App.2d 60, 62 [76 Cal.Rptr. 195].)

It is for these reasons that the judgment will have to be modified.

### THE HABEAS CORPUS PROCEEDING

 In the habeas corpus petition Henderson—whom, to avoid confusion, we shall continue to call "defendant"—makes several allegations concerning an alleged inadequacy of his counsel at the trial level[6] and one allegation of prosecutorial misconduct.

1. Defendant's first complaint is that trial counsel did not impeach Agent Taylor "by introducing the arrest report, which was available to him, at the trial to show prior inconsistent statements made by [Taylor]."

---

[6]Counsel has requested pursuant to California Rules of Court, rule 60 that we order the original of an arrest report and supplements thereto lodged with us. She has, however, attached copies to the petition. Their authenticity is not questioned. We accept them as original documents.

For what it is worth we point out that if the documents referred to had been offered and received as evidence of inconsistent statements by Taylor, they would also have been admissible on the merits. (Evid. Code, § 1235; *California* v. *Green,* 399 U.S. 149, 166-167 [26 L.Ed.2d 489, 501-502, 90 S.Ct. 1930].) The document in question consists principally of an arrest report on a printed form of the Los Angeles Police Department, a law enforcement agency other than the one which employed Taylor. It was apparently prepared by two Los Angeles Police Department interviewers, E. Lindsey and R. F. Smith. It indicates that the robbery was reported on May 12, 1970. Suspect 1 is identified as Donald Henderson. The name of suspect 2 is unknown; he is merely identified as a male Negro, 6'2" tall, weighing 170 pounds. Nothing on the report indicates whether Officers Lindsey and Smith received their information from Taylor directly or through intermediaries.

The report tells a story similar to the one told by Taylor as a witness, except that the characters of defendant and Riley are telescoped into the person referred to as suspect 2.[7] The report is to the general effect that the two persons who held up the victim, Taylor, were the same persons whom he first met that evening. If these persons were Riley and Donald Henderson, the report leaves little room for defendant to have participated in the robbery.

A supplemental report, prepared apparently a day later again lists two suspects, Donald Henderson and—this time—Riley who is now described as a male Negro, 5'11" tall and weighing 155 pounds. It contains the following statement: "5-13-70 Inv. received information from special narcotics officer, U.S. Government Dept. Of Justice, Ortiz, that Officer Taylor Williams [*sic*], his partner, had identified the above suspects as the perpetrators of the crime against him."

Finally, a second supplemental report contains the following: "5-15-70 Inv. Off. Rogers was informed by special agent Ortiz, that Taylor, his partner, had identified Jerald Rodney [*sic*] Henderson. Male, Negro 24 DOB, 8-21-45, 6-3, 165 Blk Brn 322 1/2 W 60th L.A., as the susp. standing behind him with a rifle or shotgun pointed at his head at the time Donald Henderson removed $2,040.00 from him at gun point on 5-12-70 reported under the above D.R.

"He further stated that Herbert Alan Riley was the driver of the get away car.

---

[7]There is some extrinsic evidence in the report that, whoever took it down, did not understand what he was being told and that the story he got actually did involve three suspects.

"Riley was originally named in error as the suspect holding the rifle or shotgun."

There is intrinsic evidence in the trial record that defense counsel was aware of the existence of these reports. This is part of the cross-examination of Taylor: ". . . Q. Did you subsequently identify Herbert Riley as the man who held the shotgun on you? A. No, sir, I did not. Q. Did you make an arrest report indicating that that was the man who had done it? Did you make an arrest report indicating that Mr. Riley had held a shotgun? A. No, sir, I did not. Q. Or a pistol? A. No, sir. . . ."

Defendant does not complain that counsel failed to ferret out these reports. His complaint is that he failed to utilize them.

The People have filed a declaration by trial counsel which, as far as the reports are concerned, states that he did not use the reports to impeach Taylor, because Taylor had not authored them, that it would have been futile to suggest that the original report referred to Riley as suspect number 2, since his weight and height, as revealed in the later report, did not match that suspect and that on some otherwise unidentified occasion[8] Taylor had testified consistently with his trial testimony and had identified defendant as the man with the shotgun.

If the petition for a writ of habeas corpus stated sufficient facts which, if true, would entitle defendant to some relief, we probably would have to disregard the declaration filed by the People and order an evidentiary hearing to resolve any conflict in the evidence. However, we do not believe that sufficient facts are alleged. The petition takes the position that the trial representation was so inadequate as to reduce the trial to a "farce or a sham" (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]), simply because counsel did not offer the arrest report and the supplement thereto in evidence.

Passing over the problem whether the arrest report as such would have been admissible,[9] there is no allegation in the petition that trial counsel was unaware of the possible benefits the defense might derive from making a fuss about the report. The questions asked of Taylor that we have quoted indicate a tentative stab in that direction. The answer counsel got indi-

---

[8]Probably a preliminary hearing for Riley and Donald Henderson who were arrested some time before defendant.

[9]The basis for admissibility would have been section 1280 of the Evidence Code. One part of the necessary foundation would have been proof that "[t]he sources of information . . . were such as to indicate its trustworthiness." Query whether this requirement would have been met without proof of the various steps by which the information progressed from Taylor's lips to Officer Lindsey's or Smith's pen.

cates clearly that there was substantial danger that the net result of dwelling on the arrest report might simply have been evidence that the hot-line between federal and municipal law enforcement agencies in Los Angeles needs improvement. This discovery, though fascinating, would not have helped defendant, but undoubtedly would have given Taylor a second chance to impress the court with his veracity.

In *In re Hawley*, 67 Cal.2d 824 [63 Cal.Rptr. 831, 433 P.2d 919], the petition revealed that at the outset of the petitioner's murder trial defense counsel had in his possession a psychiatric study of his client which, if believed, would have established diminished capacity to harbor malice. He also had a study prepared for the district attorney by another psychiatrist which came to the opposite conclusion. Rather than risk his client's life, defense counsel entered into a plea bargain on the basis of which the prosecution recommended life imprisonment. Denying the habeas corpus petition without ordering an evidentiary hearing the Supreme Court said: "Thus, if incompetency of counsel were here shown, it would be a ground for relief.

"But no such showing is made. There is no showing that counsel was not aware of the facts or the law, or that he was unfamiliar with a crucial defense. In fact the record shows quite the contrary. Obviously, counsel knew the facts of the case. In view of the confession and the facts admitted therein, the only possible defense related to the mental condition of the client. That the attorney was well aware of this possible defense is indicated by the fact that he secured the psychiatric report of Dr. Green." (*In re Hawley, supra*, 67 Cal.2d at pp. 828-829.)

2. In support of the habeas corpus petition defendant has obtained the affidavit of one Linda Phillips. It is to the general effect that defendant was arrested at her residence by Taylor on June 4, 1970. Several other males were present. Taylor did not know which of them was defendant until he had examined his teeth.[10]

There is no allegation in the habeas corpus petition that the failure to call Linda Phillips as a defense witness was due to defense counsel's constitutionally inadequate trial preparation. The fact that the witness was willing to come forward in support of a habeas corpus petition does not mean that she would have testified to the same effect at the time of the trial. In any event there is no allegation that defendant, who presumably

---

[10]A declaration of Taylor attached to the People's return denies, in substance, that he failed to recognize defendant immediately on entering the room where the arrest took place.

knew as much about the circumstances of his arrest as Linda Phillips, directed counsel's attention to her possible contribution.

3. It appears from another affidavit signed by a defense investigator that Taylor had advised him some time before the trial in this case that "he had learned from the defendant's sister that the defendant was the one who robbed him." It is suggested that counsel's failure to have the investigator testify to that effect amounted to inadequate representation.

Since defendant failed to introduce himself when he accosted Taylor with a shotgun, Taylor had to learn from somebody who he was. We do not see how it affects his credibility that he got the information from defendant's sister. The point has no merit whatever.

4. It is claimed that defense counsel should have brought to the court's attention that at the time of defendant's arrest the police allegedly violated section 844 of the Penal Code and did not advise defendant of his so-called *Miranda* rights.

Since no evidence was offered which, by any stretch of the imagination, could be said to be the fruit of either illegality, defense counsel acted properly.

5. Finally, to complete the list of alleged inadequacies of counsel, complaint is made that he did not argue some of the factual matters which appellate counsel has unsuccessfuly brought to our attention in connection with the appeal. It is a sufficient answer to this contention that the argument is not reported and we do not know what counsel argued. Besides, nothing is more a matter of professional judgment than argument on the facts.

Relying on *Giglio* v. *United States,* 405 U.S. 150 [31 L.Ed.2d 104, 92 S.Ct. 763], *Brady* v. *Maryland,* 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], and *Napue* v. *Illinois,* 360 U.S. 264 [3 L.Ed.2d 1217, 79 S.Ct. 1173], defendant complains that he was deprived of due process when the prosecutor did not bring the arrest report to the court's attention. None of these cases stand for the proposition that the prosecution is under a duty to direct the court's attention to evidence which may or may not be beneficial to the defense, where the defense has the evidence and chooses not to use it.

The petition for a writ of habeas corpus is denied. The judgment of conviction of first degree robbery is affirmed but modified by striking therefrom the following: ". . . The Court found that section 3024 Penal Code has no application but that section 12022.5 Penal Code does apply

. . ." and inserting in lieu thereof: "The court found that defendant was armed with a deadly weapon, to wit, a shotgun within the meaning of section 1203 of the Penal Code, but that sections 3024, 12022 and 12022.5 of the Penal Code are inapplicable."

Stephens, J., and Aiso, J., concurred.

Petitions for a rehearing were denied July 5, 1972, and the petitions of the respondent and the appellant for a hearing by the Supreme Court were denied August 16, 1972.