[Crim. No. 7033. Third Dist. Mar. 20, 1974]

THE PEOPLE, Plaintiff and Respondent, v.
WELVIE JOHNSON, JR., et al., Defendants and Appellants.

## COUNSEL

Welvie Johnson, Jr., in pro. per., and Marsha B. Shanle and Robert M. Wheatley, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, James T. McNally, Arnold O. Overoye and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—Three men held up a liquor store in Stockton. In the course of the robbery Mr. Nemie, the proprietor, was fatally shot and Linda Osborne, a customer, wounded. Defendants Johnson, Kelly and Maynard were tried by a jury. Johnson and Kelly were found guilty of Nemie's murder; of robbing Nemie and John Reyes, the liquor store clerk; of assault with a deadly weapon upon Miss Osborne. Maynard was acquitted. Johnson and Kelly appeal from the judgments.

According to the prosecution evidence, three men entered the store. Reyes was in front tending the store, and Nemie was in the back room working on the books. One of the men, identified as Kelly, pulled out a gun and ordered Reyes to lie down on the floor. The man identified as Johnson held a gun on Nemie and ordered Nemie to unlock the safe. He stood over Nemie as the latter knelt and turned the knob of the combination. Linda Osborne entered the store and was met by a man she identified as Maynard. She was ordered to go to the corner of the store and sit down facing the corner. Reyes heard the cash registers being opened and the drawers emptied. Johnson ordered Nemie to hurry unlocking the safe. The robber in the front of the store called "I have got it." At that point a shot sounded. Nemie slumped over with a fatal bullet wound in his head. A second shot wounded Miss Osborne. Approximately $2,000 in paper money was taken. The robbers ran from the store.

At the trial Reyes identified Kelly as the man who had held him at gunpoint and identified Johnson as the man who had stood over Nemie. Miss Osborne identified Kelly as one of the two robbers. She said that the third man was wearing a cover over part of his face but identified Maynard as the man.

At the trial the prosecution produced no physical evidence to identify Johnson and Kelly as the robbers. None of the stolen money was recovered. The defense attempted to discredit the identification testimony of Reyes and Miss Osborne. It relied on the fact that shortly after the robbery two

other suspects, Dean and McCoy, were taken into custody and mistakenly identified by Shoneff, a passerby who had seen three men run from the store and drive away. The defendants also relied on the fact that while Miss Osborne had made a tentative identification of Johnson from photographs, she also saw McCoy and identified the latter as the man who had stood over Nemie with the gun.

■ On appeal Kelly charges that his in-court identification by Reyes was based on a pretrial identification involving the use of impermissibly suggestive photographs. At the trial Kelly made no objection to Reyes' in-court identification; hence the claim of improper pretrial identification procedure will not be entertained on appeal. (*People* v. *Williams,* 2 Cal.3d 894, 909 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Dobson,* 12 Cal. App.3d 1177, 1181 [91 Cal.Rptr. 443].) Had such an objection been made, the trial court could have inquired into Reyes' independent recollection as the source of his in-court identification of Kelly. (See *People* v. *Martin,* 2 Cal.3d 822, 831 [87 Cal.Rptr. 709, 471 P.2d 29].) Indeed, the record shows that Reyes had seen Kelly in the store on prior occasions and knew him by sight. The absence of an objection resulted in a record which does not contain the two sets of photographs of which Kelly now complains. This reviewing court is now asked to accept Kelly's claim of improper suggestion without opportunity to review the photographs. These circumstances demonstrate why such a claim should not be received for the first time on appeal.

We do not imply that Kelly's trial counsel was derelict in not objecting. Faulty identification was at the heart of the defense in the trial court. Kelly's trial lawyer vigorously and in detail cross-examined Reyes on the subject of the witness' identification of Kelly. The cross-examination included an extensive and detailed inquiry into the pretrial identification process. For all that appears in the record, the absence of objection in the trial court was a deliberate election by the defense.

■ Both defendants assail a ruling rejecting an offer of the expert testimony of a doctor of psychology dealing with the ability of witnesses accurately to perceive, recall and relate and with the distorting effects of excitement and fear on perception and recollection.

Evidence Code section 780 enumerates the varieties of impeaching evidence a jury may consider, including (under subd. (c)) the witness' capacity to perceive, recollect and communicate. Contrary to defendants' argument, it does not follow that a party has a right to impeach a witness by calling another witness to testify as to the former's capacity. Evidence Code section 801, subdivision (a), limits expert testimony to subjects beyond the

range of common experience, thus codifying the decisional rule vesting the trial court with discretion over the subject matter of expert testimony. (See *People* v. *Cole,* 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435].) In cases not involving sex offenses California courts usually reject attempts to impeach a witness by means of psychiatric testimony. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 172 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) In *People* v. *Russel,* 69 Cal.2d 187 [70 Cal.Rptr. 210, 443 P.2d 794], the court explained in detail the criteria guiding discretion in permitting this sort of impeachment. The court declared in part: "[T]he evidence should be examined with a view to preserving the integrity of the jury as the finder of facts: expert opinion is admitted in this area in order to inform the jury of the effect of a certain medical condition upon the ability of the witness to tell the truth—not in order to decide for the jury whether the witness was or was not telling the truth on a particular occasion." (*People* v. *Russel, supra,* 69 Cal.2d at p. 196.) The court also suggested (*ibid.,* p. 195, fn. 8) that the expert witness may be in no better position to evaluate credibility than the jurors.

It is at once evident that the nature of the occurrence and the apparent psychological health of the witness, i.e., existence of a "medical" condition, are factors in the trial judge's discretion. The present occurrence was frightening but hardly deranging. There is no evidence or claim of emotional disturbance or psychological "abnormality" of any of the prosecution witnesses. (Cf. Jefferson, Cal. Evidence Benchbook, § 28.5; Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach,* 48 Cal.L.Rev. 648.) In rejecting defendants' offer of the psychologist's expert testimony, the trial court declared in effect that the testimony would take over the jury's task of determining the weight and credibility of the witness' testimony. The ruling was well within the range of discretion.

Defendants join in attacking the constitutionality of Penal Code section 189, the felony-murder statute. They base their claim upon federal Supreme Court decisions invalidating statutory presumptions in criminal cases unless there is a rational connection between the fact proved and the fact presumed. (See, e.g., *Leary* v. *United States,* 395 U.S. 6, 33 [23 L.Ed.2d 57, 80, 89 S.Ct. 1532].) Defendants' theory is that proof of robbery has no rational connection with premeditation and malice, which are the two mental factors essential to first degree murder.

The state Supreme Court has said that the felony-murder rules serves "to posit the existence of malice aforethought . . . ." (*People* v. *Ireland,* 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], quoted in *People* v. *Burton,* 6 Cal.3d 375, 385 [99 Cal.Rptr. 1, 491 P.2d

793].) It has referred to the rule as an "imputation of malice" (*People* v. *Burton, supra*) and an "implication of malice" (*People* v. *Poddar,* 10 Cal. 3d 750, 755 [111 Cal.Rptr. 910, 518 P.2d 342]). Although these expressions arouse notions akin to the presumption concept, they were not uttered in the context of the present problem.

■ A presumption is an assumption of one fact which the law requires to be drawn from another fact; it may be either conclusive or rebuttable. (Evid. Code, §§ 600, subd. (a), 601.) ■ The felony-murder rule does not make the basic felony the source of a presumption (assumption, deduction or inference) of premeditation or malice. Rather, it dispenses with premeditation and malice as elements of first degree murder. It is a "highly artificial concept," a special expression of state policy designed as a deterrent to the use of deadly force in the course of the enumerated felonies, embracing accidental or negligent as well as deliberate killings. (See *People* v. *Poddar, supra,* 10 Cal.3d at p. 756; *People* v. *Phillips,* 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Washington,* 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]; 1 Witkin, Cal. Crimes (1963) p. 283.) Bottomed as it is upon a misapprehension of the California felony-murder concept, defendants' novel constitutional argument fails.

■ Defendant Kelly in particular asserts inapplicability of Penal Code section 189, because it was Johnson, his confederate, who fired the fatal shot. He claims that armed robbery is included in fact within the offense of murder, hence that the felony-murder rule does not apply to him under the theory expressed in *People* v. *Ireland, supra,* 70 Cal.2d at pages 538-540. This contention of law was made and rejected in *People* v. *Burton, supra,* 6 Cal.3d at pages 383-388.

■ We consider propriety of the sentences. The trial court sentenced each defendant to state prison on each of three counts (murder, robbery and assault with a deadly weapon), declaring that "said sentence [is] to be served consecutively with any prior incompleted sentence defendant may now be serving." The court did not declare whether these sentences were to be consecutive or concurrent with each other.

According to Penal Code section 669, simultaneously imposed sentences are to run concurrently unless the sentencing court directs consecutive service. Each defendant was convicted of first degree murder, which is expressly punishable by life imprisonment. (Pen. Code, § 189.) When the law expressly fixes life imprisonment for one of several convictions, Penal Code section 669 requires that "terms of imprisonment on the other con-

victions, whether prior or subsequent, shall be merged and run concurrently with such life term."

In view of the statutory merger of prior sentences with a life sentence, the trial court erred in making the life sentences consecutive upon the completion of prior sentences. (*People* v. *Velarde,* 201 Cal.App.2d 231, 234-235 [19 Cal.Rptr. 832].) By force of the merger position of section 669, all sentences, prior and new, had to run concurrently with the life sentence for first degree murder. To be certain that the records of the Department of Corrections accurately reflect the law, we shall order a modification of the judgments accordingly.

■ Defendants argue that the imposition of three separate sentences, although concurrent, violates the multiple punishment proscription of Penal Code section 654.[1] Defendants cite *People* v. *Mulqueen,* 9 Cal.App.3d 532, 547-548 [88 Cal.Rptr. 235], for the proposition that separate sentences for murder and robbery are improper where, as here, the robbery was the act which made the homicide first degree murder.

In *Mulqueen* there was only one victim, while here there were three. The indictment charged and the jury convicted defendants of (1) murder of Nemie, (2) robbery of Nemie and Reyes, and (3) assault with a deadly weapon upon Miss Osborne. Section 654 does not prevent multiple sentences where a criminal transaction results in violence against several persons. (*Neal* v. *State of California,* 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839]; see also *People* v. *Bauer,* 1 Cal.3d 368, 377-378 [82 Cal. Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].) ■ Robbery is an offense against the person; thus a store employee may be the victim of a robbery even though he is not its owner and not at the moment in immediate control of the stolen property. (*People* v. *Arline,* 13 Cal.App.3d 200 [91 Cal. Rptr. 520].) ■ Here, there was evidence to support the jury's verdict that defendants robbed Reyes as well as Nemie, for at the time defendants entered the store Reyes was on duty at the front of the store and had charge of the cash registers. Where robbers hold up both a store owner and his clerk or sales person, shooting one or the other, two persons are harmed and sentences may be imposed for the violence directed at each. (*People* v. *Ridley,* 63 Cal.2d 671, 678 [47 Cal.Rptr. 796, 408 P.2d 124]; see also *People* v. *Milan,* 9 Cal.3d 185, 197 [107 Cal.Rptr. 68, 507 P.2d 956]; *In re Ford,* 66 Cal.2d 183 [57 Cal.Rptr. 129, 424 P.2d 681].) De-

---

[1]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

fendants were thus liable to separate sentences for the murder of Nemie, the robbery of Nemie and Reyes, and the assault upon Miss Osborne.

As to each of the three offenses, each defendant was charged and found guilty of using a firearm, thus incurring the additional penalty decreed by Penal Code section 12022.5.[2] Both defendants contend that Penal Code section 669 causes the penalty for use of a firearm to be merged in the life sentence for first degree murder; that the entire incident involved only a single "use" of a firearm by each defendant, thus evoking a single penalty rather than three. Kelly has an additional argument—that he did not personally use a gun in the murder of Nemie; hence section 12022.5 was erroneously applied to his murder conviction. The Attorney General, on the other hand, argues for three extensions of sentence in Johnson's case and two extensions in Kelly's.

Section 12022.5 (fn. 2, *supra*) imposes added imprisonment for use of a firearm in the commission of any of six enumerated felonies. The three felonies of which defendants stand convicted (murder, robbery and assault with a deadly weapon) are among the six listed felonies. Section 12022.5 does not define a separate criminal offense but rather an extension of the sentence for the basic crime. (*People* v. *Henry,* 14 Cal.App.3d 89, 92 [91 Cal.Rptr. 841]; see also *People* v. *Najera,* 8 Cal.3d 504, 511, fn. 6 [105 Cal.Rptr. 345, 503 P.2d 1353].) It specifies a series of minimum extensions but no maxima, for it decrees "not less than" a specified extension each time it is invoked. When no maximum term is specified, the implied maximum is life, subject to the Adult Authority's power to fix a shorter term under the indeterminate sentence law. (Pen. Code, § 671; 2 Witkin, Cal. Crimes (1963) p. 944.) Consequently, a defendant committed

---

[2]Penal Code section 12022.5 provides: "Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, rape, burglary, or kidnapping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence.

"Upon a second conviction under like circumstances, the additional period of imprisonment shall be for a period of not less than 10 years, and upon a third conviction under like circumstances the additional period of imprisonment shall be for a period of not less than 15 years, such terms of additional imprisonment to run consecutively.

"Upon a fourth or subsequent conviction under like circumstances, the defendant may be imprisoned for life or a period of not less than 25 years, in the discretion of the court.

"This section shall apply even in those cases where the use of a weapon is an element of the offense."

to prison with a finding under section 12022.5 bears an extension of sentence with a theoretical maximum of life. According to the statute, this extension commences only upon termination of his sentence for the basic crime in which he used the firearm.

Up to now Penal Code section 669 has invariably been construed to "merge" multiple sentences into an express life term, for example, that fixed for first degree murder. (See, e.g., *In re Ward,* 64 Cal.2d 672, 678 [51 Cal.Rptr. 272, 414 P.2d 400]; *People* v. *Velarde, supra,* 201 Cal.App.2d at p. 234.) Thus California law has adopted the rational stance that mortal authorities need not—perhaps should not—decree an offender's imprisonment beyond his mortal life. California has avoided inclusion among those jurisdictions which pursue the archaic rite of imprisoning a mortal man for several centuries, several lifetimes, or for a lifetime plus a span of years.

In most explicit terms section 12022.5 (fn. 2, *supra*) now directs additional imprisonment—for a term up to life—to commence only upon expiration of the basic sentence. When the basic sentence (for example, a first degree murder sentence) expires with the subject's death, section 12022.5 initiates an additional term extending for a maximum of life beyond death.[3]

California has thus joined those jurisdictions whose laws decree prison sentences beyond death. Its membership among those jurisdictions cannot be avoided by postulating a conflict between sections 12022.5 and 669. There is no conflict. Section 669 deals with the merger of separate sentences for separate crimes and does not proscribe, even by implication, the extension of sentence decreed by section 12022.5.[4] We reject defendants' "merger" contention.

We sustain defendants' objection to multiple findings of firearm use in each judgment. The three prison sentences in each judgment em-

---

[3]In examining this possibility, we emphasize that we are discussing sentences, not parole.

[4]Similarly, the courts have found no conflict between section 12022.5 and section 654, which prohibits multiple sentences for a single act or offense. *People* v. *Spencer,* 22 Cal.App.3d 786, 800 [99 Cal.Rptr. 681]; *People* v. *Henry, supra,* 14 Cal.App.3d at pp. 92-93.

anated from a single occasion on which each defendant resorted to a pistol. Usually section 654's prohibition against multiple sentences based upon a single criminal transaction will prevent judgments containing more than a single finding under section 12022.5. Multiple sentences were proper here only because there were multiple victims. This multiplicity of sentences did not engender multiplicity of weapon use. Each defendant indulged in a single "use" in the course of the liquor store holdup, thus evoking section 12022.5 but once.

The Attorney General's thesis, invoking three separate firearm penalties for a single occasion of firearm use, is inconsistent with the apparent objective of section 12022.5. A special deterrence against firearm use is its objective. The legislative theory is deterrence, whose power augments with each successive occasion. If the threat of a minimum five-year extension has failed to deter the first occasion of gun use, a second occasion may be deterred by doubling the threat, a third by tripling it. Thus the statute envisions a single application of deterrent force for each occasion, hopefully to deter gun use on a future occasion. Where, as here, a single judgment imposes sentences for several crimes committed upon a single occasion, only one finding under section 12022.5 is permissible.

 Finally, we turn to Kelly's claim that he did not personally use a gun in Nemie's murder. In applying weapon control laws other than section 12022.5 to multiparty crimes, the courts have been inclined to limit the penalty to the confederate who was personally armed. (See *People v. Hicks,* 4 Cal.3d 757, 766, fn. 4 [94 Cal.Rptr. 393, 484 P.2d 65]; *People v. Snyder,* 276 Cal.App.2d 520, 526-527 [80 Cal.Rptr. 822]; cf. *People v. Perryman,* 250 Cal.App.2d 813, 820-821 [58 Cal.Rptr. 921].) Here each defendant personally held a revolver. Although Kelly did not personally fire the shot which killed Nemie, he personally used a revolver in the series of joint offenses. Section 12022.5 penalizes those who *use* firearms in the *commission* of the listed crimes. A weapon is *used* within the meaning of section 12022.5 not only when it is fired, but when it is pointed at a victim to enforce a demand. (*People v. Chambers,* 7 Cal. 3d 666, 672-673 [102 Cal.Rptr. 776, 498 P.2d 1024].) A person *commits* a crime when he aids and abets it. (Pen. Code, § 31.) Johnson and Kelly committed three joint crimes in the liquor store holdup, including the murder of Nemie. Even though Kelly did not personally shoot Nemie, he *used* a pistol in his *commission* of Nemie's murder. He is liable to the added penalty with reference to the murder of Nemie, even though he did not do the actual shooting.

Both judgments are modified to provide that the sentences shall be concurrent with each other and concurrent with any incompleted sentences. Both judgments are further modified by striking the section 12022.5 declaration from each of the separate sentences imposed upon the defendants and by adding at the end thereof: "Defendant was charged and found to have used a firearm in the commission of the foregoing offenses within the meaning of Penal Code section 12022.5, to wit, a hand gun." As so modified, both judgments are affirmed.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied April 10, 1974, and the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied May 22, 1974.