[Crim. No. 23822. Second Dist., Div. Five. July 28, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RODERICK ANTHONY BUSH, Defendant and Appellant.

## COUNSEL

John R. DaCorsi, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Roger W. Boren, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant was charged in count I of the information with murder (Pen. Code, § 187) and in counts II, III and IV with robbery (Pen. Code, § 211). He pleaded not guilty. A jury found him guilty of one count of first degree murder and three counts of first degree robbery. The jury further found to be true, as to each count, an allegation that defendant had used a firearm in the commission of the offense. (Pen. Code, § 12022.5.) These findings are recited, with respect to each count, in the judgment. Probation was denied. Defendant was sentenced to state prison on each count. Sentence on count II was ordered to run consecutively to that imposed on count I. Sentences on the remaining counts were ordered to run concurrently with that on count I. Defendant was credited with having already served 94 days. He appeals from the judgment.

## FACTS

The evidence of defendant's guilt was overwhelming. Briefly: the robbery charged in counts III and IV was committed at Electro TV in Long Beach on December 27, 1972. Defendant entered the premises in the company of one Blackman[1] who displayed a gun and indicated that a holdup was taking place. Defendant and Blackman removed wallets from the men in the shop and purses from the women. Blackman removed the money from the cash register. He and defendant then fled. Defendant was identified at the trial by the named victims of counts III (Peter Quintus) and IV (Judy Gallo) and by three other eyewitnesses in the shop at the time of the robbery.[2] None of the witnesses saw defendant in possession of a gun on December 27, 1972.

The crimes charged in counts I and II took place on December 30, 1972, also at Electro TV. This time defendant entered the premises with one Douglas Thompson.[3] Both defendant and Thompson had guns. John Nagle, a victim (count II), testified that defendant confronted him at gunpoint inside the back of the Electro TV shop and ordered him to walk to the front of the shop. Thompson meanwhile had confronted Dave Arquette, the murder victim (count I), in the front. As Nagle

---

[1]Blackman's identity was established by defendant in conversations with police following his arrest.

[2]The other witnesses were also robbed but were not named as victims in the information.

[3]Also identified by defendant in later conversations with police.

walked toward the front, Thompson shot and killed Arquette. Defendant evidenced no reaction to the shooting. Thompson ordered Nagle to open the cash register. When Nagle did so, defendant removed the cash drawer. Defendant took another drawer containing the petty cash supply from a desk; he also took Nagle's wallet. Defendant then demanded that Nagle remove Arquette's wallet and give it to him. Nagle complied. Defendant threatened Nagle with death if he did not open a safe. When Nagle protested that he could not open the safe, defendant did not pursue the matter. Defendant and Thompson fled.

The cash trays from Electro TV and credit cards belonging to Nagle and Arquette were found within an hour of the robbery-murder in a car registered to defendant's grandfather which defendant had been seen driving only a short time earlier. Defendant's fingerprint was found on one of the cash drawers. Credit cards belonging to Peter Quintus, Judy Gallo, and two other victims of the December 27th robbery were found in defendant's bedroom on December 30, 1972.

Defendant turned himself in to police on January 1, 1973. After being advised of his constitutional rights and agreeing to talk to officers, defendant first denied complicity in the December 27th robbery. Regarding the December 30 robbery-murder, he claimed that he stayed outside the premises and was unaware of Thompson's intentions. When confronted with the credit cards which had been found in his bedroom, defendant admitted that he had participated in the December 27th incident at Blackman's suggestion; Blackman was armed, but he was not. He further confessed that he had suggested the December 30th robbery to Thompson, and that they were both armed on that occasion. Thompson entered the front door of the store and he went to the rear. While still outside he heard a shot fired. He then entered through the rear door, took charge of Nagle by pointing a .32 caliber automatic at him and ordered him to the front.

Defense counsel urged the trial court to strike the firearm allegation (Pen. Code, § 12022.5) as to counts III and IV on the ground that there was no evidence that defendant was personally armed on December 27. The court not only refused to do so, but instructed the jury if "a robbery is committed by two or more persons, and only one person uses a firearm in the commission of that robbery, all persons are responsible under Penal Code section 12022.5 for using a firearm in the commission of the robbery."

After deliberating slightly more than two hours, the jury returned to the courtroom and asked the following question, " 'Are we to determine if Roderick Bush actually had a firearm in his personal possession during the period of the robbery on December 27, 1972, in the special finding?' " The jury was reinstructed[4] and returned to its deliberations.

## DISCUSSION

■ Defendant's contentions relating to the convictions on the basic counts have no merit whatsoever.

Defendant asserts that there is no evidence that he shared his accomplice's intent as to the shooting, that the shooting occurred outside the scope of the robbery, and that his conviction on count I therefore cannot be sustained. The record does not substantiate defendant's contentions. While the wanton shooting of Arquette was not necessary to effectuate the robbery, it occurred on the premises and preceded the taking of any property. Defendant did not abandon the project after the shooting; he proceeded with the robbery and threatened to kill the second victim if he did not follow certain directions. ■ "Under the felony murder doctrine, the intent required for a conviction of murder is imported from the specific intent to commit the concomitant felony." (*People* v. *Sears,* 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938].) Defendant's reliance on *People* v. *Washington,* 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], is misplaced. There the killing was not perpetrated by an accomplice. Rather there was an attempt to hold defendant liable, under the felony-murder rule, for the death of his accomplice at the hands of the intended robbery victim. ■ There is ample evidence to sustain defendant's conviction of count I. Nor does it constitute cruel or unusual punishment to impose the penalty for first degree murder on defendant under the circumstances of this case. (*People* v. *Wade,* 53 Cal.2d 322, 336 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Johnson,* 38 Cal.App.3d 1, 7-8 [112 Cal.Rptr. 834].)

■ The only viable issues on this appeal are these: First, did the trial court correctly instruct the jury that the use of a firearm in the commission of a robbery by one of several robbers, without more, subjects all principals to the additional punishment prescribed by section 12022.5 of the Penal Code? Second, if the instruction was erroneous, was the error prejudicial in this case?

---

[4]Presumably in the language of the previously quoted instruction. The reporter's transcript simply reads: "(Jury reinstructed on the law in the case.)"

To put the problem in perspective: Under the trial court's instruction, if one of several persons guilty of robbery uses a firearm, all others are subject to the additional penalty of section 12022.5, regardless of what their personal involvement—or lack thereof—with that use may be. In this connection we note that the court correctly instructed the jury that one can be a principal in the robbery merely by aiding and abetting the offense. (Pen. Code, § 31.)

The People claim the instruction was 100 percent correct: that "a defendant could be found derivately liable under Penal Code section 12022.5 . . . where his crime partner is the one who personally 'uses' the firearm in the commission of the robbery."

Defendant, on the other hand, argues that the additional punishment prescribed by section 12022.5 can be imposed only on a defendant who personally had his hand on the trigger.[5] The defense argument is essentially based on reasoning that section 12022 of the Penal Code, which imposes additional punishment for being armed with a deadly weapon has consistently been interpreted to apply only to defendants who are personally armed. (*People* v. *Hicks,* 4 Cal.3d 757, 766, fn. 4 [94 Cal.Rptr. 393, 484 P.2d 65]; *People* v. *Stuart,* 3 Cal.App.3d 817, 823 [83 Cal.Rptr. 841]; *People* v. *Snyder,* 276 Cal.App.2d 520, 526-527 [80 Cal.Rptr. 822]; *People* v. *Eaton,* 275 Cal.App.2d 584, 592 [80 Cal.Rptr. 192]; *People* v. *Tarpley,* 267 Cal.App.2d 852, 858-859 [73 Cal.Rptr. 643]; *People* v. *Smith,* 259 Cal.App.2d 814, 818 [66 Cal.Rptr. 551].)[6] The argument then proceeds: When, in 1969, section 12022.5 was passed, the last three cited cases were already in the books. Since section 12022.5 was a legislative response to the cases which culminated in *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862],[7] holding section 12022 inapplicable where being armed was an element of the offense (*People* v. *Henry,* 14 Cal.App.3d 89, 92 [91 Cal.Rptr. 841]), it cannot be assumed that the 1969 Legislature—knowing that the word "armed" in section

---

[5]Defendant accepts, of course, that for the firearm to be "used" it is not necessary that it be fired. (*People* v. *Chambers,* 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024]; *People* v. *Washington,* 17 Cal.App.3d 470, 474 [94 Cal.Rptr. 882].)

[6]Dicta in cases such as *People* v. *Gilliam,* 41 Cal.App.3d 181, 193 [116 Cal.Rptr. 317], *People* v. *Henderson,* 26 Cal.App.3d 232, 237 [102 Cal.Rptr. 670], and *People* v. *Washington, supra,* 17 Cal.App.3d 470, 474, are to the effect that "anyone who uses a firearm must necessarily be armed with it." *(People* v. *Washington, supra.)* None of these cases focuses on the possibility that one robber, though personally unarmed, may nevertheless be using a firearm with which his accomplice terrorizes the victims.

[7]*People* v. *Floyd, supra,* was decided only eight days before the Governor signed chapter 954 of the 1969 statutes—section 12022.5.

12022 had been interpreted to apply only to defendants personally armed—would have used virtually identical language in section 12022.5 with respect to the concept of "use" unless it wanted to preserve the judicial interpretation of section 12022.

The People's argument in defense of their theory that section 12022.5 is vicariously applicable is more complex. Summarized, this is it: Before 1949, section 1203 of the Penal Code forbade the granting of probation to defendants who were "armed with a deadly weapon." Cases such as *People* v. *Gillstarr,* 132 Cal.App. 267, 268-269 [22 P.2d 549], *People* v. *Lewis,* 140 Cal.App. 475, 477 [35 P.2d 561], and *People* v. *Stevens,* 32 Cal.App.2d 666, 669-670 [90 P.2d 595], applied this prohibition to defendants convicted of robbery who were not personally armed and whose guilt was—to use the People's expression—"derivative" by way of section 31 of the Penal Code. (See particularly *People* v. *Lewis, supra,* where the defendant remained in the car during the armed robbery committed by his codefendant.) In 1949 the Legislature amended section 1203 by inserting the word "himself" before the word "armed." *People* v. *Perkins,* 37 Cal.2d 62 [230 P.2d 353], then held that these cases were no longer the law and that probation could be granted if the defendant was not personally armed. Important to the People's argument is the undeniable fact that the "holdings"[8] that section 12022 only comes into play if the defendant was personally armed can all be traced to *Perkins.* (See, particularly, *People* v. *Smith, supra,* 259 Cal.App.2d at p. 818.) *Perkins,* however, is no longer the law because in the 1971 revision of section 1203 (Stats. 1971, ch. 706, § 1), the word "himself" was dropped.[9] Therefore section 12022 must no longer be read as requiring a "personally armed" defendant and any interpretation of section 12022.5 that relies on the *Smith-Tarpley-Eaton-Snyder* line of cases relating to section 12022 is wrong.

[8]Strictly speaking, it is questionable whether, at least as of the time section 12022.5 became the law, any case really held that "armed" in section 12022 meant "personally armed." Every single decision we have been able to find was a conviction for armed robbery where the finding that section 12022 applied had to be set aside not because the defendant was not personally armed but because under the doctrine which culminated in *People* v. *Floyd, supra,* the section was not applicable at all. Since none of the cases found involves a situation where the defendant's accomplice but not defendant was armed while committing crimes such as larceny or embezzlement, statements that 12022 applied only if the defendant was personally armed were not necessary to the decisions.

[9]It is noted that all parts of the 1971 version of section 1203 prohibiting probation in certain cases are subject to express statutory provisos. (See also *People* v. *Clay,* 18 Cal.App.3d 964 [96 Cal.Rptr. 213].) In any event, nothing in this opinion should be construed to agree with the People's interpretation of section 1203 as it now reads.

We think that neither side is correct. The People's argument suffers from two flaws: First, we find it difficult to ascertain the legislative intent of 1969, when section 12022.5 became the law, by relying on what the Legislature may have intended two years later when it revised section 1203. Second—and more basically—if we were to accept the invitation to use the 1971 amendment to section 1203 to retrace the path by which section 12022 came to be interpreted, we would only end up in a cul-de-sac: The most that the People's argument leads to is a holding that since 1971 probation should normally be denied to defendants convicted of certain crimes if they or their accomplices were armed with a deadly weapon at the time of the commission of the crime. The law, however, is that section 12022 does not purport to define a crime, but imposes an increased punishment on a defendant, convicted of any felony, for a reason personal to that defendant: that he was armed with a deadly weapon when he committed the crime. (*In re Shull,* 23 Cal.2d 745, 749 [146 P.2d 417] ["The provisions of section [12022] . . . do not create a separate offense. They merely impose additional punishment for the felony committed, when armed with ʼthe weapons mentioned."]; Cf. *People* v. *Johnson, supra,* 38 Cal.App.3d 1, 12; *People* v. *Henderson, supra,* 26 Cal.App.3d 232, 237, fn. 4.) Similarly, section 12022.5 does not define a crime, but merely provides for increased punishment for defendants who, convicted of certain crimes, have used a firearm in the commission of the crime. (*People* v. *Johnson, supra; People* v. *Henderson, supra.*) Thus, the People's ingenious exercise in the art of statutory interpretation actually leads nowhere.[10]

Defendant's argument suffers from a different defect: It assumes, without further analysis, that the Legislature anticipated that the word "use" in section 12022.5 would and should be interpreted in precisely the same way as the word "armed" had theretofore been construed in section 12022 cases. We see no basis for that assumption.

In common parlance, when we speak of a person being armed, we mean precisely that he is personally armed. The V.I.P. who ventures out to "press the flesh" is not considered armed because of his bodyguard's .45 automatic. Thus, the interpretation of section 12022 at which the

---

[10]The People's argument also ignores that for purposes of making a defendant ineligible for parole, section 1203 has traditionally equated being armed at the time of the commission of the offense with being armed at the time of the arrest. This alone makes construction of section 12022 by reference to the periodic changes of section 1203 a futile endeavor: section 12022 has nothing whatever to do with the defendant's readiness for armed combat at the time of his arrest.

courts arrived by the somewhat tortuous route traced by the People was really nothing but a construction which accorded with common understanding.

On the other hand, a person can "use" an article without personally handling it. Among the many definitions of the word "use" in Webster's New International Dictionary (3d ed. 1966) we find: (1) "to put into action or service"; (2) "have recourse to or enjoyment of"; (3) "to carry out a purpose or action by means of"; (4) "make instrumental to an end or process"; (5) "apply to advantage" and (6) "to benefit from the use of".

None of these meanings suggests that the person using the thing in question personally possesses, handles, or wields it. When two robbers enter a store and one holds the victims at bay with his gun while the other relieves them of their possessions, clearly the latter "benefits from the use of" the former's weapon, has "recourse" to it, carries "out his purpose or action by means of" the gun and makes it "instrumental to an end." Having in mind that in *People* v. *Chambers,* 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], the Supreme Court held that "[t]he obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed," it is clear that an interpretation of section 12022.5 which restricts the application of that section to defendants who personally handle firearms would be counterproductive.

Our remaining problem is to determine how this holding affects the disposition of this case. Undoubtedly the trial court's instruction was broader than our interpretation of section 12022.5, in that it permitted the jury to find the section appliable even if the defendant had nothing whatever to do with the use of the weapon, knew nothing about it, did not acquiesce therein, or take advantage of it during the commission of the robbery.

■ As far as the December 30th robbery-murder is concerned, we have no doubt that the error is quite harmless. Three versions of defendant's participation in the incident were before the jury. As far as Nagle's testimony is concerned, there is no question that defendant used a firearm both in the robbery and during the murder of Arquette. Defendant's own initial statement to the police was a denial that he had ever entered the store on that date or had any knowledge that Thompson planned a robbery. We know that this exculpatory statement did not

raise a reasonable doubt in the jury's mind, for it convicted defendant on counts I and II. (*People* v. *Sedeno*, 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) According to defendant's second version, he was outside the store when Thompson shot Arquette, but came inside immediately thereafter and started to issue orders to Nagle at gunpoint. In that version, he disassociated himself physically from the homicide, but personally handled a firearm to complete the robbery.

The error was harmless, even if the jury had a doubt that defendant was in the store at the time of the homicide. ■ It is the law that with respect to one "occasion" only one finding under section 12022.5 is permissible, regardless of the number of victims. (*People* v. *Johnson, supra,* 38 Cal.App.3d 1, 12.)[11] The single permissible finding is therefore amply supported by the robbery of Nagle.

■ Even as to the December 27th incident, we have no doubt that defendant did not suffer prejudice from the trial court's broad interpretation of section 12022.5. While there is no evidence that defendant was personally armed during the robbery, it is clear that he and Blackman entered the store on a joint mission, during which Blackman terrorized the victims with his gun and that both Blackman and defendant took advantage of the victims' lack of resistance by relieving them of their property. In every sense of the word, defendant used Blackman's gun to achieve the joint objective of the two robberies. Whatever the outer limits of the meaning of "use" in section 12022.5 may be—and we make no attempt to define them—the jury which found defendant guilty on counts III and IV on the evidence presented by the People, had no

[11]"We sustain defendants' objection to multiple findings of firearm use in each judgment. The three prison sentences in each judgment emanated from a single occasion on which each defendant resorted to a pistol. Usually section 654's prohibition against multiple sentences based upon a single criminal transaction will prevent judgments containing more than a single finding under section 12022.5. Multiple sentences were proper here only because there were multiple victims. This multiplicity of sentences did not engender multiplicity of weapon use. Each defendant indulged in a single 'use' in the course of the liquor store holdup, thus evoking section 12022.5 but once.

"The Attorney General's thesis, invoking three separate firearm penalties for a single occasion of firearm use, is inconsistent with the apparent objective of section 12022.5. A special deterrence against firearm use is its objective. The legislative theory is deterrence, whose power augments with each successive occasion. If the threat of a minimum five-year extension has failed to deter the first occasion of gun use, a second occasion may be deterred by doubling the threat, a third by tripling it. Thus the statute envisions a single application of deterrent force for each occasion, hopefully to deter gun use on a future occasion. Where, as here, a single judgment imposes sentences for several crimes committed upon a single occasion, only one finding under section 12022.5 is permissible." (*People* v. *Johnson, supra,* 38 Cal.App.3d 1, 11-12.)

choice except to find that he used his codefendant's firearm. The fact that it affirmatively inquired of the court whether it was necessary that defendant "actually have a firearm in his personal possession during the period of the robbery on December 27, 1972" merely indicated that it was aware of the fact that defendant was not personally armed. In no way does the jury's query suggest a doubt that defendant used Blackman's weapon for his own purpose.

## DISPOSITION

The judgment will have to be modified for two reasons: First, as already noted, the maximum number of findings under section 12022.5 is two, rather than four; and, second, since the punishment on count I is life imprisonment, section 669 of the Penal Code requires that all sentences run concurrently.

Accordingly, the trial court is directed to modify the judgment by striking the section 12022.5 finding as to counts I and III and by making all sentences run concurrently with the sentence on count I. In all other respects, the judgment is affirmed.

Stephens, J., and Hastings, J., concurred.