[Crim. No. 16181. First Dist., Div. One. Dec. 12, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY WILLIAMS, Defendant and Appellant.

**COUNSEL**

Lawrence R. Horn, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Jamie Jacobs-May, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

SIMS, J.—Appellant has appealed from a judgment of imprisonment entered on jury verdicts which found her guilty of murder in the second degree, aggravated by the use of a firearm in the commission of the offense. The victim died from wounds inflicted by the appellant's sister. She shot him with her own weapon in response to an appeal that she do so from the appellant. At the time the appellant was engaged in a struggle with the victim over her own weapon, which was never fired. The sister was acquitted, and the appellant contends that the verdict finding her guilty must be set aside because it is inconsistent with the verdict acquitting her sister, who in fact fired the fatal shots. She also asserts that the finding that she used a gun in the commission of the offense cannot be sustained under the circumstances of this case.

We conclude, from our examination of the record, that the jury were justified in finding that the appellant, with malice, caused the victim's death by using her sister as an innocent agent to accomplish the intended death of the victim. The evidence supports the implied findings that the appellant was the aggressor in the mutual combat between herself and the victim; that her use of a deadly weapon supplied the necessary malice for murder; that, failing to decline any further struggle after the

victim acted to protect himself, she was not entitled to justify his killing as in self-defense; and that through her entreaty, she was the effective cause of the discharge of the firearm in her sister's hand. The fact that the sister was acquitted is of no comfort to appellant, because each acted under different circumstances.

The evidence also sustains the finding that appellant used a firearm within the provisions of section 12022.5 of the Penal Code, as it read prior to July 1, 1977.

Appellant and her former boyfriend, Charles Brooks, had two children, aged six and seven, respectively, at the time of the events in question. They had been living separately, but recently she had spent a night with him at his house. The children were apparently in Brooks' custody but were actually kept by a friend of his.

On April 20, 1976, according to the appellant's prior statement to her uncle and subsequent statement to the police, Brooks telephoned appellant and asked her if she wanted to come over to his house to see the children. She drove over to the house where Charles Brooks lived with his brother Henry Brooks about 5 o'clock in the afternoon, and when she arrived she asked Brooks where the children were. The appellant told the police that Brooks told her they were upstairs. When, after they had both gone upstairs, appellant discovered the children were not there, she and Brooks began to argue. He told her to leave. A struggle ensued in which, according to her report to the officer, Brooks struck appellant with a hammer. She suffered a cut beneath her left eye. According to Brooks she struck her face against the door jam as he was attempting to pull her out of his room. He denied having invited her over, or having told her the children were there.

Appellant used the telephone at the house to call the police. On his arrival, Officer Churchill observed Brooks striking appellant and knocking her down in the front yard. The officer took Brooks into custody and then went in the house with appellant so the officer could continue his investigation of the incident. While they were in the house Brooks' brother-in-law, Tillman Washington, arrived with his wife and stepson. Brooks asked him to keep the house secure until he or his brother returned. The appellant refused to leave the house and insisted that she had some belongings upstairs that she wanted to get. Washington wanted her to leave and asked the officer to remain until she did so. The officer

told her to go and to wait until Brooks was released from custody, and then the police would help her retrieve her belongings if necessary.

Appellant was angry and belligerent. With the officer's permission, she telephoned her sister Jo Ann and asked her to come over and pick her up. When Jo Ann, accompanied by their uncle, arrived she found the appellant bleeding and very upset. Jo Ann tried to calm her sister and get her to leave, but finally it was necessary for her and the uncle to physically escort appellant out of the house. As appellant was leaving she turned to the crowd which had gathered, and looking at Officer Churchill and Washington, who were standing together, shouted, "I'm going to kill both you mother fuckers" or words of similar import.

Appellant got into her uncle's pickup truck and drove off with him, followed by Jo Ann, driving the car in which appellant had driven to Brooks' residence. A short time later both vehicles stopped in the parking lot of a nearby store. Appellant, who had apparently calmed down, told Jo Ann she wanted to return to Brooks' house and get her belongings. Jo Ann tried to persuade her to go to a hospital instead, but was unsuccessful. She tried to calm her sister and told her not to argue with anyone at Brooks'. They returned directly together, according to Jo Ann, although they each gave statements to the police which indicated appellant returned home and secured a weapon.

During the foregoing events several people had assembled at the Brooks' house. In addition to Washington, the victim, his wife and stepson, the next door neighbors and their daughter and nephew were also in and out of the house. These witnesses all observed various aspects of the incidents which marked the defendant's two visits to the Brooks' house. From their testimony, although with some conflicts, the events which transpired may be pieced together as set forth herein.

On arrival at Brooks' house the two sisters approached the front door. Appellant knocked on the front door and entered while her sister waited outside. Once inside appellant asked permission to retrieve her belongings. Washington refused her request, and tried to calm her and convince her to leave. Meanwhile, Jo Ann had grown impatient and also asked appellant to leave. Appellant then walked toward the door followed by Washington. Jo Ann heard her say, "What you do that for?" As appellant and Washington reached the door, the appellant drew a weapon from her purse. A struggle broke out between them. Washington tried to grab her hands and remove the gun and the struggle continued.

Jo Ann approached and viewed the participants struggling over the gun. She did not know to whom the gun belonged or who had started the altercation. Jo Ann did observe that Washington had gained the upper hand, and that although appellant had a hand on the gun it was close to, and pointing at, the appellant's face. She thought Washington was going to kill her sister. Jo Ann produced a gun from her own clothing and yelled, "Drop my sister or I'll shoot!" or "Let my sister go or I'll shoot!" As the struggle continued appellant shouted, "Shoot him! Shoot him!" or "Kill him! Kill him!" Appellant at no time tried to retreat or end the struggle. Washington retained his grasp on the gun. Jo Ann then fired the gun three or four times and Washington died of the resulting gunshot wounds.

Appellant grabbed Jo Ann, who was in a trance-like state, and the two fled the scene in their car. They were spotted by an airborne patrol and were arrested a short time later. The gun Jo Ann threw out of the car was retrieved. An expended cartridge and two rounds of ammunition were also found near the gun.

The appellant did not testify in her own defense. Her sister's testimony supported her own defense that the homicide was justifiable as committed in defense of a third person.

The court instructed the jury concerning the various degrees and forms of homicide, and the principles governing justification by reason of self-defense or defense of another.[1] The jury acquitted Jo Ann but returned a verdict of second degree murder against the defendant.

---

[1] The court instructed the jury with regard to defense of another as follows: "Homicide is justifiable and not unlawful when committed by any person in the defense of her sister if a reasonable man in a like situation would believe that the person killed intended to commit a forceable and atrocious crime and that there was eminent [sic] danger of such crime being accomplished. A person may act upon appearances whether such danger is real or merely apparent. [¶] The reasonable ground of apprehension does not require actual danger, but it does require that the person about to slay another be confronted by the appearance of a peril such as has been mentioned; that such appearance arouse in his mind an honest conviction and fear of the existence of such a peril; that a reasonable man in the same situation, seeing and knowing the same facts, would have, and be justified in having, the same fear; and that the killing be done under the influence of such fear alone. [¶] A forcible and atrocious crime, as the term is used in these instructions, is any felony, the character and manner of the commission of which threatens, or is reasonably believed by the defendant to threaten, life or great bodily injury so as to cause in him a reasonable fear of death or great bodily injury. [¶] Murder is a forcible and atrocious crime. [¶] Homicide is justifiable when committed in defense of any person when there is reasonable ground to apprehend a design to commit a forcible and atrocious crime against such person, and eminent [sic] danger of such design being accomplished; but if the person in whose behalf the defense was made, was the

## I

( When the facts are examined in the light of principles of law governing aiders and abettors, self-defense, defense of another, commission of a crime through the innocent agency of another, and criminal liability for acts reasonably resulting from the provocation of the use of deadly force, it is clear that any alleged inconsistency in the verdicts does not exist, and that the evidence sustains appellant's conviction of murder.

## A

The evidence may have been sufficient to sustain a finding that the appellant and her sister armed themselves and returned to the Brooks' house with the intent and purpose of either securing what appellant sought regardless of what resistance might be encountered, or to inflict vengeance or punishment on Washington for his prior refusal to permit the appellant to reenter the house. (See *People* v. *Durham* (1969) 70 Cal.2d 171, 185 [74 Cal.Rptr. 262, 449 P.2d 198] [cert. den. (1969) 395 U.S. 968 (23 L.Ed.2d 755, 89 S.Ct. 2116), and (1972) 406 U.S. 971 (32 L.Ed.2d 671, 92 S.Ct. 2416)]; *People* v. *Simpson* (1954) 43 Cal.2d 553, 571 [275 P.2d 31]; *People* v. *Travis* (1880) 56 Cal. 251, 255; *People* v. *Villa* (1957) 156 Cal.App.2d 128, 133 [318 P.2d 828]; *People* v. *Turner* (1948) 86 Cal.App.2d 791, 801-802 [195 P.2d 809]; *People* v. *Blackwood* (1939) 35 Cal.App.2d 728, 732 [96 P.2d 982]; and *People* v. *Terman* (1935) 4 Cal.App.2d 345, 347 [40 P.2d 915].) If such were the case there would be some merit in the appellant's contention that the acquittal of her sister, who fired the fatal shots, precludes finding appellant guilty as an aider or abettor or a coconspirator. (See *People* v. *Allsip* (1969) 268 Cal.App.2d 830, 831-832 [74 Cal.Rptr. 550].) It is also recognized that an aider or abettor cannot be guilty of a greater offense than the principal offender. (See *People* v. *Petruzo* (1910) 13 Cal.App. 569, 577 [110 P. 324]; and *People* v. *Sidelinger* (1908) 9 Cal.App. 298, 299 [99 P. 390].)

---

assailant or engaged in mutual combat, he must really and in good faith have endeavored to decline any further struggle and clearly inform his adversary of his desire for peace before the homicide was committed. [¶] However, you may consider any evidence of an honest belief by Jo Ann concerning her sister's safety as I shall instruct you."

The first, third and fourth paragraphs (CALJIC Nos. 5.13 and 5.16 (1974 rev.) were requested by the People and by the defendant Jo Ann. The second paragraph (CALJIC No. 5.14) was requested by the defendant's sister alone. The fifth paragraph was a combination of CALJIC Nos. 5.13 and 5.54, as offered by the People; and the sixth paragraph was added to that instruction by the court.

It is not, however, every case in which the acquittal of one criminally responsible will serve to exonerate his confederate who has been found guilty. There may be a discrimination against the law, but not against the convicted defendant, when the jury displays an understandable reluctance to impose guilt on a codefendant who was only vicariously responsible for a homicide. (See *People* v. *Stone* (1963) 213 Cal.App.2d 260, 264-265 [28 Cal.Rptr. 522]; and *People* v. *Blackwood, supra,* 35 Cal.App.2d 728, 732-734.)

In *People* v. *Stembridge* (1950) 99 Cal.App.2d 15 [221 P.2d 212], the two codefendants apparently acted in concert to permit the acquitted defendant to fight a bartender who had denied him service. The defendant, convicted of murder, was armed. He not only threatened to kill any spectator who interfered, and as well the bartender, but also fired his weapon in the air, and deliberately shot twice at the victim, a spectator. With respect to his contention that the verdicts were inconsistent the court stated: "There was no inconsistency in the verdict as it was within the jury's province to find one defendant guilty and the other not guilty. Both defendants were found not guilty of the burglary charge. As to the murder charge, the evidence shows that Stembridge fired the fatal shots. There was a deliberate intention on his part to kill, evidenced by statements made by him at the time of the killing and subsequent thereto. There was a marked difference in the evidence as to the actions of each of the defendants." (99 Cal.App.2d at p. 24. See also *People* v. *Powell* (1950) 99 Cal.App.2d 178, 182-183 [221 P.2d 117]; *Bingham* v. *Commonwealth* (1919) 183 Ky. 688, 693 [210 S.W. 459, 461]; and *Parker* v. *Commonwealth* (1918) 180 Ky. 102, 109 [201 S.W. 475, 478]. Cf. *Belcher* v. *Commonwealth* (1918) 181 Ky. 516, 517 [205 S.W. 567, 568].)

In the *Bingham* case the Kentucky court stated, "If Bingham secretly designed to bring about the death of Matney, and in furtherance of his plan induced Belcher to accompany him to the Matney home on the occasion of the homicide, and thus provoked and brought about the difficulty, which he further fomented by remaining at Matney's gate and quarreling and abusing him until Belcher, who had run off some distance, was so encouraged and abetted that he began to fire at Matney, and Matney's death resulted directly from the designing aid and encouragement of Bingham, though Belcher acted in sudden heat of passion, Bingham would be guilty of willful murder, though Belcher was guilty only of voluntary manslaughter. [Citations.]" (183 Ky. at p. 693 [210 S.W. at p. 461].)

Here, however, it is clear that the jury in acquitting the sister, rejected any such approach. They necessarily found that the sister's account of her participation in the affray was correct, and that she fired the fatal shots, not with the malice that accompanied the appellant's act of accosting the victim with a loaded gun, but under circumstances which appeared to the acquitted sister as rendering it necessary to protect the life of the appellant. Therefore we cannot say that the sister's acquittal of necessity absolved the appellant, unless it appears that the jury was compelled to find that appellant herself was entitled to use the deadly force, in fact invoked by her sister, in her own defense. The record fails to compel such a conclusion.

### B

Section 197 of the Penal Code provides in pertinent part: "Homicide is also justifiable when committed by any person in any of the following cases: [¶] 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, . . . [¶] 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or, . . ." (See Note, *Justifiable Force* (1961) 13 Stan.L.Rev. 566, 572-575.)

In order to justify a homicide under the plea of self-defense it must appear not only that the defendant actually believed himself in deadly peril, but that as a reasonable man he had sufficient grounds for his belief. (*People* v. *Glover* (1903) 141 Cal. 233, 239 [74 P. 745]; and *People* v. *Ortiz* (1923) 63 Cal.App. 662, 668 [219 P. 1024].)

The rule governing the effect of aggression is colorfully set forth in *People* v. *Conkling* (1896) 111 Cal. 616 [44 P. 314], as follows: "If it be assumed that at the time of the killing deceased was at the opening in the fence for the purpose of preventing the defendant at all hazards from going through, and if it also be assumed that defendant was there intending to pass through at all hazards, still the question of self-defense is presented to the jury, regardless of the respective rights of the parties to the road. Under such circumstances, the man who began the deadly

affray—that is, who by some overt act caused the other, as a reasonable man, to believe that he was in great danger of loss of life or limb—placed himself without the protection of the law, and must take the consequences, whether those consequences be his death upon the ground, or the penalty imposed after trial by judge and jury." (111 Cal. at pp. 621-622. See also *People* v. *Graham* (1923) 62 Cal.App. 758, 762-764 [217 P. 823].) The court noted it was qualified by principles set forth by commentators as follows: " 'We are thus brought to the conclusion that where a person has been feloniously assailed, and the felon has desisted from his attempt and taken to flight, the right to pursue for the purpose of private defense ceases, as soon as, in the reasonable belief of the assailed, the danger has ceased to be immediate and impending.' " (*Id.*, p. 627. See also *People* v. *Farley* (1899) 124 Cal. 594, 597 [57 P. 571]; and Warren on Homicide (1938) §§ 151 and 152, pp. 664-700. Cf. *People* v. *Westlake* (1882) 62 Cal. 303, 307 and 310, Sharpstein, J. dissenting; and *People* v. *Travis, supra*, 56 Cal. 251, 254-255, both disapproved on this issue in *People* v. *Conkling, supra*, 111 Cal. at p. 627.)

■ Here from the uncontradicted testimony of the bystanders it appears that appellant commenced the affray by drawing the weapon from her purse and threatening Washington. He was justified in using all force necessary in resisting the threat to his life, and she had no justification for using deadly force against him unless she first desisted from her intent to shoot at Washington.

On the evidence presented, if appellant had succeeded in shooting Washington in the course of their struggle she would have been criminally liable, without justification, for the homicide. In the light of the evidence of her prior threats, her arming herself, and her unprovoked assault with a deadly weapon on Washington the jury was justified in finding, if not compelled to find, the requisite malice for murder. She herself, however, did not fire the fatal shots.

C

Section 197 recognizes the right of one person to use deadly force to resist any attempt of a third party to murder another person, to resist any attempt of another to commit a felony, and to resist any attempt of a third party to do some great bodily injury upon another person. (§ 197, subd. 1.) That subdivision does not specify whether the actor may act when there is a reasonable ground to apprehend that any of such circumstances exist, or whether the circumstance relied upon must

actually be as they appear. On the other hand, when a person acts in self-defense, or, in the lawful defense of a person bearing a specified relationship, the conditions under which the act is justifiable are spelled out. (§ 197, subd. 3. See Warren on Homicide, *supra,* § 161, pp. 791-795.)

In *People* v. *Roe* (1922) 189 Cal. 548 [209 P. 560], the conviction of one, allegedly coming to the defense of another, was reversed, because the court gave instructions, not warranted by the evidence, that "one who willfully and deliberately, for the purpose of creating a necessity for self-defense, provokes, by the commission of a felonious assault, a deadly counter-attack upon him, cannot, because of and in the course of the counter-attack, kill his assailant and then invoke the defense of self-defense or the defense of the person of another who, as the result of the original assault, became involved in and was being subjected to the deadly counter-assault." (189 Cal. at pp. 551-552.) The court noted that the foregoing principle "comports with a fundamental feature of the law of self-defense as settled and accepted in this jurisdiction, . . ." (*Id.,* p. 552.) It found, however, there was prejudicial error in view of the evidence, in giving an instruction placing on the defendant the burden of establishing her defense by a preponderance of the evidence, rather than by merely creating a reasonable doubt that the homicide was not justifiable. The court stated, "In short, if there be evidence, as we are satisfied there is, sufficient, if believed, to have warranted, under the rule of reasonable doubt, a finding that the affray out of which the killing of the deceased ultimately resulted, was, at its inception, not more than a simple assault upon the deceased, then the deceased would not have been justified in using any greater force than would have been necessary to have defended himself against and repelled such assault. [Citation.] And if, as the defendant claims and the evidence introduced in her behalf tends to show, the deceased in retaliation of a simple assault, or a simple trespass, committed a felonious and murderous assault upon her codefendant Bowers, then it cannot be said that the right of the defense of the person of Bowers against the consummation of such felonious and murderous assault may be rightfully denied to the defendant, Maybelle Roe." (*Id.,* pp. 557-558.) The court approved that part of the opinion of the District Court of Appeal which indicated that it was a proper statement of law that the plea of justification of defense of a third person was unavailing if the assault upon the third person by the deceased victim was procured by the former or made under the appearance of hostility created by the third person, with a view of having his adversary act upon it, or, in other words, if the two parties were fighting, the defense was not available if the victim was not the aggressor, and the

third party had failed to use all reasonable means to avoid further conflict. (*Id.,* pp. 563-564.) Instructions along those lines were found erroneous because of the error in reference to the burden of proof. (*Id.*) Here, as we have seen, the evidence sustains the implied finding that the appellant, not the victim, was the aggressor, and that she threatened the victim with great bodily injury.

In *People* v. *Travis, supra,* the court upheld the manslaughter conviction of the defendant who killed another in defense of his brother. As in this case there were several possibilities regarding the criminal liability of the alleged rescuer. The court stated: "It is manifest from the circumstances of the killing, as given in evidence, that John Travis was the assailant in the encounter in which Hill was slain. The sudden assault made upon Hill caused him to move backward a few steps, in the direction of the defendant's position, in a hostile attitude toward his assailant. This assault upon Hill, or the backward movement of Hill, or both combined, caused the defendant to resort to his revolver, and to rise to his feet and advance upon Hill for one of two purposes; namely, either to aid and abet his brother in the assault upon Hill, or to defend the life or limb of his brother from the threatening and impending danger from Hill's pistol. If the former, the defendant would not be guiltless in causing Hill's death; if the latter, he was exercising a legal right, if the circumstances under which he acted justified him in exercising the right." (56 Cal. at pp. 255-256.) The circumstances were evaluated as follows: "There is no doubt that a man has a legal right to defend himself against the sudden and unexpected assault by another; but if the assault does not seriously injure him, nor contain in itself circumstances of imminent danger of injury to him, and the circumstances in which he is placed by it are sufficient to justify him in the belief that such danger exists, he has no right to take advantage of the opportunity which such an assault gives him, to slay his assailant. If Hill attempted to do so under such circumstances, the defendant had a legal right to interfere to prevent it. The law makes it the duty of every one who sees a felony attempted by violence to prevent it if possible; and allows him to use the necessary means to make his resistance effectual. [¶] If, on the other hand, the circumstances were in themselves sufficient to justify Hill in the belief that his life was in danger from the sudden assault made upon him, he had the right to defend himself against it, even to the extent of taking the life of his assailant, if necessary; and *any one who killed him, while so engaged in the performance of a lawful act, would not be guiltless in his death.*" (*Id.,* pp. 256-257, italics added. See also *Murphy* v. *State* (1949) 188 Tenn. 583, 585-587 [221 S.W.2d 812, 813].)

In *People* v. *Will* (1926) 79 Cal.App. 101 [248 P. 1078], the court upheld the murder conviction of a confederate who claimed he came to the defense of another who was seeking under claim of right to remove the decedent from his habitation. The court said, "There can be no doubt that Will manifestly intended and endeavored and actually did enter the cabin in a violent manner for the purpose of forcibly ejecting Carl therefrom. . . . Worth is in no better position than Will. He knew that Will had wrongfully and unlawfully engaged in a violent struggle with Carl. 'A person interfering in a difficulty in behalf of another simply steps in the latter's shoes; he may lawfully do in another's defense what such other might lawfully do in his own defense but no more; . . . and his act must receive the same construction as the act of the person defended would receive if the homicide had been committed by him.' (30 C.J. 79; *People* v. *Travis,* 56 Cal. 251, 256.)" (79 Cal.App. at p. 114.)

In *People* v. *Ortiz, supra,* 63 Cal.App. 662, the court sustained a conviction of manslaughter of one who had furnished a gun to a friend involved in an affray, against a contention that the court had erroneously refused his instruction on self-defense. It said: "To justify the taking of human life on the ground of self-defense, it is not sufficient to show that the one who committed the act believed that his life was in danger from a threatened attack, but it must appear that he had *reasonable cause to believe* that he was in *imminent* danger of losing his life or suffering great bodily harm and that he believed, as a reasonable man, that it was necessary for him then and there to take the life of the deceased to save himself from death or great bodily harm. The same rule must apply in the case of an accused who, being present and knowing the situation of the principals, participates by putting a deadly weapon into the hands of one of them." (63 Cal.App. at pp. 668-669.)

The foregoing cases indicate that the sister may have received more favorable instructions than she deserved. (Cf. fn. 1 above.) The evidence showed that appellant initiated an assault with a deadly weapon upon the victim. If the sister were deemed to stand in appellant's shoes she acted without justification. The law, however, is not so well settled. In *State of Chiarello* (1961) 69 N.J.Super. 479 [174 A.2d 506, cert. den. (1962) 36 N.J. 301 (177 A.2d 343)], the court reviewed existing precedents and commentaries concerning whether the rescuer acts on the justification available to the one he seeks to protect, or upon the situation as it would appear to a reasonable person in the position of the rescuer. The court stated, "The clearly defined issue disclosed by the differences between the charge as given, and those requested by defendant, has split

the American jurisdictions which have ruled on the matter substantially equally." (69 N.J.Super. at p. 486 [174 A.2d at pp. 509-510]. See Note, *Justifiable Force, supra,* 13 Stan.L.Rev. 566, 595-597; 2 Burdick, Law of Crime (1946) § 437, pp. 134-137; Warren on Homicide, *supra,* § 161, pp. 797-800; 40 Am.Jur.2d, Homicide, §§ 171-172, pp. 457-458; and 40 C.J.S., Homicide, § 108, subd. a, pp. 967-969.)

We do not have to resolve that matter in this case. The sister, although not related to appellant, as prescribed in subdivision 3 of section 197 of the Penal Code, was given the advantage of the rule prescribed by that subdivision. Therefore, it is clear that the jury could find that appellant was in fact the aggressor, and not entitled to commit a homicide in her own defense, and also find that the sister was entitled, as a reasonable person, to act on the appearance that the victim was threatening appellant with great bodily injury.

## D

■ "Under section 31 of the Penal Code, a person is a principal in a crime, although he does not directly commit the act constituting the offense, when he aids and abets in its commission, or, not being present, advises and encourages its commission. [Citation.]" (*People* v. *Koomer* (1961) 188 Cal.App.2d 676, 680 [10 Cal.Rptr. 607].) In *People* v. *Smith* (1929) 96 Cal.App. 373 [274 P. 451], the defendant contended he could not be criminally responsible for the burglary committed by two men he had sent to retrieve materials, which he falsely represented were his, from the house of another. The court observed, "By their verdict the jury in the instant case found that the defendants Smith and Boreman were innocent agents of Peterson in the commission of the crime. There does not appear to be any cases directly in point in this state where an innocent party committed a criminal act at the instigation of another who alone possessed the criminal intent. However, in Russell on Crimes, volume 1, page 165, the author says: 'When an offense is committed through the medium of an innocent agent, the employer, though absent when the act is done, is answerable as a principal. Thus, if a child under years of discretion, a madman, or any other person of defective mind, is incited to commit a murder or other crime, the incitor is the principal *ex necessitate,* though he were absent when the thing was done. . . . And if a man give another a forged note that the other may utter it, if the latter be ignorant of the note being forged, the uttering by the latter is the uttering of the former, though the former were absent at the time of the actual uttering.' [¶] McClain in his work on Criminal Law, volume 1, section

187, says: 'The general maxim *"Qui facit per alium facit per se"* is applicable in criminal law to make one accountable for acts done for him by an agent under his instruction or by his consent. And in regard to the liability of the principal it is wholly immaterial whether the act is procured to be done through a guilty or an innocent agent. If the act is done through an innocent agent, the one who procures it to be done is guilty as principal, as though he had done the act himself. But if the agent or servant through whom the act is done is guilty, the principal or master is deemed an accessory before the fact only, unless present.' [¶] In Wharton's Criminal Law, volume 1, page 312, section 241, the author says: 'A party also who acts through the medium of an innocent or insane person, or a slave, is guilty, *though absent,* as principal in first degree.' (Italics ours.) [¶] Based upon such respectable authorities, the conclusion follows that Peterson, as the directing and procuring mind, was the principal in the burglary though absent in person and not actually participating in the commission of the crime. It makes no difference if he stood in the street outside the house and directed the actions of the agent or did so from his shop several miles away." (96 Cal.App. at pp. 379-380. See also *People* v. *Pounds* (1959) 168 Cal.App.2d 756, 758 [336 P.2d 219]; *State* v. *Robinson* (1973) 283 N.C. 71, 78 [194 S.E.2d 811, 816-817]; *State* v. *Benton* (1970) 276 N.C. 641, 653-654 [174 S.E.2d 793, 801.] Note, *Bingham* v. *Commonwealth, supra,* 183 Ky. 688, 693 [210 S.W. 459, 461]; and 40 Am.Jur.2d, Homicide, §§ 22 and 25, pp. 314-315 and 316-317; and 17 Cal.Jur.3d, Criminal Law, § 90, pp. 146-147.)

■ In the instant case the appellant maliciously and wilfully assaulted the victim with a deadly weapon. Finding her purpose frustrated by his resistance, she had no justifiable action other than to withdraw from the fray. There is nothing to give rise to the inference that Washington, if he had disarmed appellant, would have shot her. Appellant, however, elected to continue the struggle. As we have seen, if she succeeded in wresting control of the weapon from Washington and killed him, she would be criminally responsible. We have no hesitancy in concluding that under those circumstances, her exhortation and command to her sister to shoot the victim render her liable for the same consequences.

In *People* v. *Ceballos* (1974) 12 Cal.3d 470 [116 Cal.Rptr. 233, 526 P.2d 241], the court noted: "In the United States, courts have concluded that a person may be held criminally liable under statutes proscribing homicides and shooting with intent to injure, or civilly liable, if he sets upon

his premises a deadly mechanical device and that device kills or injures another." (12 Cal.3d at p. 476.) It applied the rule to sustain the conviction of the defendant of assault with a deadly weapon, because the use of such a device was not justifiable to prevent a burglary. So here the use of her sister's gun by appellant, when appellant herself was not justified in using such force, may subject appellant to criminal liability.

### E

Our conclusions that the conviction must be upheld are strengthened by reference to the developing law of the liability of one participating in a felony involving force or violence for a homicide occurring during the course of such a crime.

In *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622], the court reaffirmed the principle that the felony-murder doctrine, concededly not applicable here, could not be used to render one of several perpetrators of a felony named in Penal Code section 189, guilty of murder of another perpetrator who was killed by a third person in the course of the commission of the felony. (12 Cal.3d at p. 690. See also *People* v. *Antick* (1975) 15 Cal.3d 79, 87 [123 Cal.Rptr. 475, 539 P.2d 43]; *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 582 [91 Cal.Rptr. 275, 477 P.2d 131] [overruled on other grounds *People* v. *Antick* (1975) 15 Cal.3d 79, 92, fn. 12 (123 Cal.Rptr. 475, 539 P.2d 43)]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 703-704 [47 Cal.Rptr. 909, 408 P.2d 365] [revd. on other grounds (1967) 388 U.S. 263 (18 L.Ed.2d 1178, 87 S.Ct. 1951)]; and *People* v. *Washington* (1965) 62 Cal.2d 777, 780-781 and 782-783 [44 Cal.Rptr. 442, 402 P.2d 130].) Nevertheless, the court recognized that a defendant might be found guilty on a theory of vicarious liability if it independently appeared that his confederates entertained malice aforethought. (12 Cal.3d at p. 691. See also *People* v. *Antick, supra,* 15 Cal.3d 79, 87-89; *Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 582-585; *People* v. *Gilbert, supra,* 63 Cal.2d 690, 704-705; and *People* v. *Washington, supra,* 62 Cal.2d 777, 781-782.)

In *People* v. *Washington, supra,* the latter concept was enunciated as follows: "All persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design. [Citations.] *Moreover, when the defendant intends to kill or intentionally commits acts that are likely to kill with a conscious disregard for life, he is guilty of murder even though he uses another person to accomplish his objective.* [Citations.] [¶] Defendants

who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' (*People* v. *Thomas*, 41 Cal.2d 470, 480 . . . [concurring opinion]), and it is unnecessary to imply malice by invoking the felony-murder doctrine." (62 Cal.2d at p. 782, fn. omitted, italics added.)

In *People* v. *Gilbert, supra,* the court analyzed the responsibility of the criminal for a killing committed by the victim or a police officer as follows: "When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life. [¶] Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice. [Citations.]" (63 Cal.2d at pp. 704-705. See also *People* v. *Antick, supra,* 15 Cal.3d 79, 87-88; and *Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 583-584.)

In *Taylor* v. *Superior Court, supra,* the court recognized that it was not necessary for the accused to fire the first shot in order to make him responsible for a homicide committed by another in response to his actions. Malice was inferred from acts of provocation consisting of the robber's coercive conduct toward one of his victims, his repeated threats of "execution," and his confederate's intent and nervous apprehension as he held the victims at gunpoint. (3 Cal.3d at p. 584.) The court noted that it had been held that an accused's resistance to a command to put up his hands and his pointing his gun toward the officers and toward his kidnap-victim supplied the essential malice and provocation for the resulting gunplay (*People* v. *Reed* (1969) 270 Cal.App.2d 37, 45-46 [75 Cal.Rptr. 430]), and that an accused's grasping the gun of an officer who was ordering him to leave a riot area was of similar import. (*Brooks* v. *Superior Court* (1966) 239 Cal.App.2d 538, 539-540 [48 Cal.Rptr. 762].)

In the later *Taylor* case the defendant's conviction was set aside because, although he was a confederate of the victim of the homicide

and a survivor who had both threatened their victims, he was entitled, under the doctrine of collateral estoppel, to assert the acquittal of the murder charge of his codefendant, the survivor of the two in the store. (*People* v. *Taylor, supra,* 12 Cal.3d 686, 691-698.) The court was careful to point out, however, that it limited its holding to the particular circumstances of the instant case where the accused's guilt must be predicated on his vicarious liability for the acts of a previously acquitted confederate. (*Id.,* p. 698.)

In the *Antick* case the court posited an exception to the rule announced in *Washington,* applied in *Gilbert* and *Taylor I,* and recognized in *Taylor II.* The victim was the confederate who initiated the shootout, and the court concluded: "As [the victim] could not be found guilty of murder in connection with his own death, it is impossible to base defendant's liability for this offense upon his vicarious responsibility for the crime of his accomplice." (15 Cal.3d at p. 91.)

Notwithstanding *Antick,* if the accused himself was guilty of provocative conduct which resulted in the response which was fatal to his confederate, there is a direct, not vicarious, liability for murder and the conviction may be sustained. (*In re Tyrone B.* (1976) 58 Cal.App.3d 884, 889-890 [130 Cal.Rptr. 245]; and *People* v. *Velasquez* (1975) 53 Cal.App.3d 547, 554-555 [126 Cal.Rptr. 11].)

From the foregoing we conclude that as in *Gilbert, Taylor I, Tyrone B.* and *Velasquez,* the appellant by her provocative conduct in assaulting Washington with a deadly weapon created a situation in which the dilemma was thrust not upon the victim or the policeman, but the potential rescuer. It was reasonably to be expected that the rescuer, be it of the victim or of the original aggressor, would reasonably respond by shooting at whomsoever appeared to be placing another in danger of great bodily injury, and such shooting should not be considered an independent intervening cause for which the appellant, who initiated the assault with a deadly weapon, is not liable.

## II

At the time of the commission of the offense and of appellant's trial and conviction, Penal Code section 12022.5 provided in pertinent part as follows: "Any person who uses a firearm in the commission or attempted commission of . . . murder, . . . upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a

period of not less than five years. . . ." ■ Appellant contends that since the victim was shot by her sister rather than by her that the jury erroneously found the additional use of a firearm charge to be true.

In *People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306], the court disapproved *People* v. *Bush* (1975) 50 Cal.App.3d 168 [123 Cal.Rptr. 576], which had held that an armed defendant "used" a firearm by taking the victims' wallets while his confederate held them at gunpoint. It concluded that "the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime." (18 Cal.3d at p. 242.)

Here the crime, as we have demonstrated, was committed by the appellant. Whether we consider the weapon she carried, or that in the hand of her sister, she used a firearm to commit the murder. In *People* v. *Chambers* (1972) 7 Cal.3d 666 [102 Cal.Rptr. 776, 498 P.2d 1024], the court pointed out: "By its enactment of section 12022.5 the Legislature provided an additional punishment for a wrongdoer who 'uses a firearm' in the commission or attempted commission of certain felonies and it left no doubt as to the applicability of such punishment even in those cases where 'the use of a weapon' is also an element of the offense." (7 Cal.3d at p. 672.) It continued: "We next direct our attention to that conduct which constitutes use of a firearm within the meaning of the statute. By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. [Citation.] One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. [Citation.] Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*Id.* See also *In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23]; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 12 [112 Cal.Rptr. 834]; and *People* v. *Aguilar* (1973) 32 Cal.App.3d 478, 486 [108 Cal.Rptr. 179].)

Appellant's contention appears to be answered by *People* v. *Johnson, supra.* There the fatal shot was fired by a confederate, not one found to be an innocent rescuer, but the court's language concerning the defendant who also used a weapon during the incident is applicable here. "In applying weapon control laws other than section 12022.5 to multiparty crimes, the courts have been inclined to limit the penalty to the confederate who was personally armed. [Citations.] Here each defendant personally held a revolver. Although Kelly did not personally fire the shot which killed Nemie, he personally used a revolver in the series of joint offenses. Section 12022.5 penalizes those who *use* firearms in the *commission* of the listed crimes. A weapon is *used* within the meaning of section 12022.5 not only when it is fired, but when it is pointed at a victim to enforce a demand. [Citation.] A person *commits* a crime when he aids and abets it. (Pen. Code, § 31.) Johnson and Kelly committed three joint crimes in the liquor store holdup, including the murder of Nemie. Even though Kelly did not personally shoot Nemie, he *used* a pistol in his *commission* of Nemie's murder. He is liable to the added penalty with reference to the murder of Nemie, even though he did not do the actual shooting." (38 Cal.App.3d at p. 12.) *Johnson* was approved in *In re Culbreth, supra,* 17 Cal.3d at page 334, and was distinguished from *People* v. *Bush* and approved in *People* v. *Walker, supra,* 18 Cal.3d at pages 239-240. Here by her use of the firearm appellant initiated the incident which terminated in the murder of Washington. It was certainly the purpose of the Legislature to deter the use of firearms for assaults with a deadly weapon, not only because the discharge of that weapon might result in a homicide, but also because such use creates a situation where a homicide may ensue because of the reasonable intervention of another. The use here was such a precipitating event of the resulting homicide which was properly found to be murder.

We further note that the appellant's conviction of murder is predicated upon the theory that she in effect used the firearm discharged by her sister. (Cf. *People* v. *Ceballos, supra,* 12 Cal.3d 470, 480.)

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.