[Crim. No. 32630. Second Dist., Div. One. Dec. 5, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
DON CARL CLAFLIN et al., Defendants and Respondents.

2

COUNSEL

John K. Van de Kamp, District Attorney, Arnold T. Guminski and
Eugene D. Tavris, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, George Meyerhoff and H. Reed Webb, Deputy Public Defenders, Harry W. Brainard, Brian M. Moore and Carl Burkow for Defendants and Respondents.

**OPINION**

**LILLIE, Acting P. J.**—Defendants were charged with assault on a peace officer with a deadly weapon (count I), assault with a deadly weapon (count II), assault with intent to commit murder on Robert Hewitson (count III), assault with intent to commit murder on Robert Srery (count IV) and murder of Robert Moats (count V). The People appeal from order setting aside counts III, IV and V.

The following evidence was adduced on the preliminary hearing. Hewitson, an off-duty deputy sheriff, and his wife and children drove to a garage owned by Deputy Srery; while Mrs. Hewitson was testing her brakes a rock was thrown at her automobile; Hewitson confronted defendant Barber about the incident, and defendants Claflin, Cook and the deceased, Robert Moats, approached them; an angry exchange took place between Deputy Hewitson and defendants and Moats; meanwhile Deputy Srery joined Hewitson, and during the confrontation Hewitson was compelled to identify himself as a deputy sheriff, and showed them his badge; Moats forcibly took his badge from him, and Hewitson drew his gun; Barber and another pushed Hewitson against the hood of his vehicle, then Barber unsuccessfully grabbed for the gun; Barber then tried to strike Deputy Srery; Moats was heard to ask "Should I go get my gun?" whereupon he left; after a slight scuffle the deputies retreated to Srery's garage where they called police to report the rock throwing incident, the confrontation and the theft of Hewitson's badge.

Hewitson and his wife and two children and Deputy Srery waited at the entrance of the garage for police to arrive; about 3 minutes later they looked up and saw defendants running directly toward them while Moats positioned himself behind the hood of Hewitson's pickup truck 14 to 18 feet away; Moats held a revolver with both hands steadying his arms on the hood and pointing the gun directly at Hewitson; at the same time Cook and Claflin charged Hewitson; Cook had both hands clenched together with arms stretched over his head; Hewitson drew his gun, Srery told defendants to "just go away" and "forget it," and Cook who by that time was near Hewitson, brought his arms and fists in a downward motion in an attempt to strike Hewitson, who stepped aside; Cook then

grabbed the barrel of Hewitson's gun to take it from Hewitson, whereupon Hewitson shot him and Cook fell to the ground; Claflin went over to help Cook; meanwhile Moats still had his revolver aimed directly at Hewitson and Hewitson shot Moats who moaned and fired a return shot at Hewitson; Hewitson yelled at his wife and children to leave then ran into the garage to call police; Deputy Srery retrieved his gun from his car and ran to the pickup truck; Hewitson saw Moats raise his head up and point his gun at Deputy Srery as he ran; Hewitson fired at Moats but missed then Moats fired a round at Hewitson; another shot by Moats broke a window in Srery's car, and debris struck Hewitson; another figure crouched behind one of the vehicles and Srery fired at him; during the exchange of shots a male voice called out "You shot my friend. Call an ambulance." and shortly thereafter Claflin ran away but stopped when police arrived; Moats tried to run between the pickup and Srery's automobile; Hewitson, who was still on the telephone to police, shot Moats to prevent him from firing at Srery; further shots were fired by the others and the confrontation terminated when police arrived.[1]

Moats died of a gunshot wound inflicted by a bullet from Hewitson's gun. Cook and Barber were lying on the ground near the body of Moats, and Claflin was nearby. Officer Wolleck handcuffed Barber, searched him and found in his boot Moats' 44 magnum revolver; Moats had fired four rounds.

At the conclusion of the preliminary hearing, the magistrate found "No. 1, that all of the defendants knew that Deputy Hewitson was a deputy sheriff. [¶] No. 2, all of the defendants knew that Deputy Hewitson was armed with a gun. [¶] No. 3, all of the defendants knew that Deputy Hewitson had returned to [Srery's garage] from the scene of the first confrontation. [¶] No. 4, all of the defendants went to [Srery's garage] with knowledge that decedent, Mr. Moats, was armed with a gun. [¶] No. 5, Deputy Hewitson was engaged in the performance of his duties of a peace officer at the time of the shooting at [Srery's garage.]"

In the superior court the defendants moved to dismiss the information pursuant to section 995, Penal Code. Indisputably the evidence established, and the superior court found, malice aforethought on the part of Moats who with defendants went to the area of Srery's garage, positioned

[1]Respondents assert that the battle ended before police arrived but the cross-examination of Deputy Hewitson leaves this in doubt. Even on direct-examination he testified that after the fourth shot there were other shots directed at him. It is true that there is a conflict in his testimony but for the purpose of this review we must draw every legitimate inference that may be drawn from the evidence in favor of the information. (*Rideout* v. *Superior Court*, 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

himself from the pickup truck and aimed at Hewitson subsequently firing "some rounds" which showed "a conscious disregard for human life and an act likely to kill." After exploring several theories of liability, the superior court, relying on *People* v. *Williams,* 75 Cal.App.3d 731 [142 Cal.Rptr. 704], posed the question whether defendants were guilty of provocative conduct which resulted in the response which was fatal to Moats, which would impose a direct responsibility on them; it held they were not, observing that Claflin "is barely a peripheral person," Barber wound up with the weapon in his boot but this does not "put him over to the homicide section of life," as to Cook "it seems incredible that a person who had to know that the deputy had a weapon would go the half a block distance and charge the location . . . it has a high probability that it will result in certain death" calling it "a suicide run," and that Moats "came out there spoiling for something bigger than any of the other three." Thus finding no provocative conduct on the part of the defendants, the court granted the motion as to counts III, IV and V.

It is not contended by appellant that Moats' malice may be imputed to the defendants by resort to the felony-murder rule (see *Taylor* v. *Superior Court,* 3 Cal.3d 578, 582 [91 Cal.Rptr. 275, 477 P.2d 131]; *People* v. *Gilbert,* 63 Cal.2d 690, 705 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Washington,* 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]); nor under the facts here can it be urged that defendants could be held criminally responsible for the death of Moats under the doctrine of vicarious liability. (*People* v. *Antick,* 15 Cal.3d 79, 88-91 [123 Cal.Rptr. 475, 539 P.2d 43].) However, the court in ruling on defendants' motion invoked the rule of direct liability stated in *People* v. *Williams,* 75 Cal.App.3d 731 at page 748 [142 Cal.Rptr. 704]: "Notwithstanding *Antick,* if the accused himself was guilty of provocative conduct which resulted in the response which was fatal to his confederate, there is a direct, not vicarious, liability for murder and the conviction may be sustained. (*In re Tyrone B.* (1976) 58 Cal.App.3d 884, 889-890 [130 Cal.Rptr. 245]; and *People* v. *Velasquez* (1975) 53 Cal.App.3d 547, 554-555 [126 Cal.Rptr. 11].)"

Thus the issue before us is the correctness of the superior court's determination that defendants themselves were not guilty of provocative conduct which resulted in the response of Deputy Hewitson which was fatal to Moats. First, we note the specifically articulated factual determinations of the magistrate that all of the defendants knew Hewitson was a deputy sheriff and all of them knew he had returned to Srery's garage, and that defendants went there with Moats with knowledge that Deputy Hewitson was armed with a gun and that Moats was also armed. Second,

we observe the standard of review applicable to the court's determination. ■ "A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency. [Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. [Citations.]" (*Rideout* v. *Superior Court,* 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

■ Finally, our examination of the record with the foregoing in mind, compels a reversal of the order under *People* v. *Williams,* 75 Cal.App.3d 731, 748 [142 Cal.Rptr. 704]. There is merit to the contention that inasmuch as all defendants went to the garage knowing that Hewitson and Moats each had a gun, each of them was engaging in conduct indisputably provocative of potentially lethal gunfire. What other rational explanation can there be for defendants' advance on Srery's garage with the knowledge that both Deputy Hewitson and Moats were armed than that they went there with Moats to participate in an attack on the deputies knowing it likely would result in a fatal shootout—conduct manifesting a conscious reckless disregard for human life. The superior court found malice aforethought on the part of Moats in going to the garage, and the inference that Moats would not have charged the location and attempted such a potentially dangerous confrontation had defendants not accompanied him is reasonable. When they advanced on Hewitson and Srery, Moats positioned himself 14 to 18 feet away behind the hood of the pickup and aimed his loaded gun directly at Hewitson covering him while the other defendants engaged in activities directed to provoke Hewitson. With Claflin running behind him, Cook raised his arms over his head, ran up to Hewitson and brought his fists down in an attempt to strike him; failing that Cook then tried to take Hewitson's revolver from him. This attack on Hewitson was brazenly executed without regard for the exchange of gunfire defendants must have known it would provoke because they knew that Moats, partially protected behind the hood of a vehicle, had Hewitson covered with a loaded gun. This attack on Hewitson made with conscious reckless disregard for human life set the stage for the shootout that followed. There is evidence to support the view that defendants' conduct was intended by each of them to, and did, provoke Hewitson to engage in an exchange of gunfire with Moats. What they failed to foresee was that Hewitson would shoot Cook first, then to protect himself against retaliatory fire, shoot Moats.

At this stage of the criminal proceedings we conclude that there is evidence to support the finding that defendants themselves were guilty of

engaging in provocative conduct which resulted in Hewitson's response which was fatal to Moats. Certainly Claflin was not the "barely . . . peripheral person" characterized by the court. He advanced on Hewitson directly behind Cook and when Cook was shot and the exchange of gunfire started Claflin ran around screaming, his flight frustrated by arrival of police. Nor was Barber a mere bystander, for he was far more involved than as observed by the court, merely "winding up" with a weapon in his boot. The initial confrontation over the rock throwing incident which occurred only three to five minutes before the shootout and only a half a block from the garage, was between Hewitson and Barber; Moats forcibly took Hewitson's badge from him but it was Barber who pushed Hewitson against the hood of the vehicle and attempted to take his gun away from him then tried to strike Deputy Srery. This alone did not constitute provocative conduct on the part of Barber but it cannot be ignored in the light of his going with Claflin, Cook and Moats to the garage knowing that Hewitson and Moats were armed, and the fact that after the fatal gunfight he was found with Moats' gun in his boot. Barber either took the gun from Moats after Moats fired the four rounds intending to use it on Hewitson and Srery but did not because of arrival of police, or removed the gun from where Moats had fallen so that the weapon would not be found near the body. During the initial confrontation Moats left to get his gun and, within minutes, ran accompanied by defendants to the garage to which the deputies had retreated. Moats initiated and provoked the hostile confrontation at Srery's garage, but not alone; defendants each participated in conduct provocative of Hewitson's exchange of gunfire with Moats they must have known would likely ensue and result in injury or death.

The order is reversed.

Thompson, J., and Hanson, J., concurred.

Petitions for a rehearing were denied January 2, 1979, and respondents' petitions for a hearing by the Supreme Court were denied February 1, 1979.